425 A.2d 156 (1980)
In re Mary Reeser SEVERNS.
William H. SEVERNS, Plaintiff,
v.
The WILMINGTON MEDICAL CENTER, INCORPORATED, a corporation of the State of Delaware; Richard S. Gebelein, as Attorney General for the State of Delaware; Martin Gibbs, M. D., and The Board of Medical Practice of the State of Delaware, Defendants.
Court of Chancery of Delaware, New Castle County.
Submitted November 7, 1980.
Decided December 31, 1980.
Thomas Herlihy, III, of Herlihy & Herlihy, Wilmington, for plaintiff.
William J. Wade, of Richards, Layton & Finger, Wilmington, for defendant Wilmington Medical Center, Inc.
Edward Kafader, Deputy Atty. Gen., for defendants Richard S. Gebelein, Atty. Gen. of the State of Delaware, and the Board of Medical Practice of the State of Delaware.
Martin Gibbs, M. D., pro se.
G. Thomas Sandbach, Wilmington, for Mary Reeser Severns.
*157 MARVEL, Chancellor:
On December 6, 1979, Mary Reeser Severns, who was at the time fifty-five years of age, while driving alone in a motor vehicle, was seriously injured when said vehicle veered from the Brackenville Road on which it was being driven, and plunged into a wooded area by the side of the road. Some time thereafter Mrs. Severns was found in a coma and was taken by ambulance to the Delaware Division of the Wilmington Medical Center where she thereafter resided for most of the following year. She has recently been moved to a nursing home, namely, the Episcopal Church Home situate on the Lancaster Pike.
According to her physician, Dr. Martin Gibbs, Mrs. Severens' neck was broken in the accident in question and her brain was apparently thereafter deprived of oxygen for a sufficient time to destroy the basic functions of the upper portion of her brain, the part of the brain which has to do with normal human capability to be aware of one's environment, to think, recall, and speak, as well as to possess a personality and engage in various intellectual activities as a sentient and sapient human being.
As a result of having sustained a broken neck in the accident, injury was sustained to Mrs. Severns' brain stem as well, which portion of the brain controls its more primitive but essential functions, such as controlled breathing, the regulation of blood pressure, and the rate of one's heart beat.
On arrival at the hospital, Mrs. Severns was attached to a respirator, being unable to breathe properly without artificial help, and a tube was surgically inserted in her trachea. A catheter was also applied and intravenous feeding instituted. And while at the expiration of the year and more which has expired since her accident, Mrs. Severns remains in a coma, there has been a partial recovery in the primitive functions of her brain and her coma is not as deep as a year ago due in part at least to the mending of the injury to her brain stem. Thus, she no longer has need for a respirator to support normal breathing, the tracheal tube has been removed, and she is fed a life-sustaining formula by means of a naso-gastric tube. She responds by moving her ankle and toes to a scratching of the sole of her foot. Her right eye reacts to light and moves to the right when cold water is placed in her right ear. In addition, she makes a primitive sucking noise when her lips are touched. However, according to the medical testimony adduced at the recent hearing in this case, these responses to stimuli do not mean that a sapient and sentient brain exists in Mrs. Severns' body but merely that parts of her body are capable of reacting without conscious awareness on her part. Thus, she does not suffer discomfort and does not feel pain according to her physician, Dr. Gibbs. No assurance can be given, however, that there will be any dramatic improvement in the functions of her upper brain.
Questions as to the power of this Court to appoint Mrs. Severns' husband as guardian of her person and to grant him authority to act for her in seeking Court approval of the discontinuance of the supportive measures now being administered, which tend to prolong *158 the life of Mrs. Severns in a virtual vegetative state, having been considered by the Supreme Court of Delaware on certification, this is the opinion of the Court following the evidentiary hearing ordered to be held by the reviewing court in its opinion reported as Severns v. Wilmington Medical Center, et al, Del.Supr., 421 A.2d 1334 (1980).
At such evidentiary hearing, Mr. Severns, who will now be appointed guardian of the person of his wife, in advancing his wife's alleged constitutional right in the nature of a right to privacy, not to be subjected to extraordinary medical invasions of her body, asks that she be permitted to die a natural death and not have her meaningless vegetative life continued by the use of contemporary medical techniques. He specifically asks that he be authorized to direct the appropriate medical authorities in the event of an emergency, which, if untreated would constitute a threat to life, not to place her in a respirator, that a feeding tube not be replaced surgically in her trachea, that no drugs or medicines be administered to her other than those normally used for a bodily hygiene, particularly constipation and diarrhea, and finally that a so-called no code blue order be entered on her medical chart, which if authorized, would prevent the dispatch of a special medical team to her bedside trained to revive a patient who has been suddenly stricken and threatens to die as a result of a heart attack or the like. The guardian also asks that any proposed criminal prosecution or civil suit threatened to be filed against any person who has honored the provisions of an order entered by this Court designed to protect Mrs. Severns' alleged constitutional right to die a normal death be enjoined.
Prior to her accident Mrs. Severns had expressed a wish that in the event she were to become unable to reason and care for herself as a result of an accident or illness that she did not want to be kept alive in a vegetative state but would like to be allowed to die with dignity. In pursuance of such principle and wish she became an active member of the Delaware Euthanasia Education Council in 1973 and remained a member until 1976, a primary purpose of such organization being to support legislation establishing the right to die with dignity, and in 1975 Mrs. Severns had proposed to her husband that each execute a so-called living will, each of which read in part as follows:
"If there is no reasonable expectation of my recovery from physical or mental disability, I ______________, request that I be allowed to die and not be kept alive by artificial means or heroic measures."
It was apparently only because of Mr. Severns' reluctance to execute a last will and testament containing such a request that her plan was not consummated. However, now, as the proposed guardian of the person of his wife, Mr. Severns seeks to assert her right as an adult to decline to submit to other than superficial medical treatment even though such treatment may apparently be essential to the preservation of her life. See Annotation in 93 A.L.R.3rd 67, "Patient's Right to Refuse Treatment Allegedly Necessary to Sustain Life."
Although the constitution of the United States does not explicitly recognize a so-called right to privacy, nonetheless the Supreme Court of the United States has recognized that certain areas of one's private life may be successfully protected from outside intrusion, Eisenstadt v. Baird, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), and Stanley v. Georgia, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969), and judicial intrusion into many aspects of individual decisions has been limited by reason of the absence of a legitimate judicial interest and responsibility for such decisions many of which fall within the protection of the bill of rights, Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965).
And while the so-called right to privacy, such as the right to decline medical treatment, is not absolute and must yield to a compelling State interest in the general preservation of life, such as the prevention of suicide, the prevention of injury to innocent *159 third parties, particularly minors, and the maintenance of the ethical integrity of the medical profession, however, where a human life is doomed to continue into the indefinite future in a vegetative state, the interest of the State in the preservation of human life is diminished in importance by the concomitant rise in the right of an individual, expressed through a guardian, to decline to be kept alive as a veritable vegetable. In short, the value of a life is diminished not so much by an election of an ill person in a hopeless situation to decline treatment or by permitting a comatose person, who has no hope of recovery to normality, to make a choice through a guardian to have artificial means of staying alive in a comatose state removed as by a denial of such person's right to privacy. As stated in In re Quinlan, N.J.Supr., 70 N.J. 10, 355 A.2d 697 (1976):
"We think that the State's interest contra weakens and the individual's right to privacy grows as the degree of bodily invasion increases and the prognosis dims. Ultimately there comes a point at which the individual's rights overcome the State interest."
I have no doubt but that an incompetent may exercise his or her right to privacy by the substituted judgment of one acting on his or her behalf. Superintendent of Belchertown v. Saikewicz, 373 Mass. 728, 370 N.E.2d 417 (1977), and that were a guardian, as here, not permitted to act for an incompetent and assert such incompetent's right to privacy, then such right becomes meaningless. In the Matter of Spring, Mass.Supr., ___ Mass. ___, 405 N.E.2d 115 (1980). Furthermore, there is Delaware precedent for the proposition that a guardian may be authorized to carry out the previously expressed intent of an infirm person, and it has been noted earlier in this opinion that Mrs. Severns prior to her accident had expressed a wish that she not be kept alive in a vegetative state, In re Iréneé duPont, Del.Ch., 194 A.2d 309 (1963).
In analyzing a patient's right to refuse to submit to medical treatment, weighed against the State's interest in the preservation of life, courts have attempted to distinguish between ordinary and extraordinary medical treatment, a patient often being required by Court order to submit to ordinary treatment while being permitted to refuse to submit to extraordinary treatment, Matter of Quackenbush, 156 N.J.Super. 282, 383 A.2d 785 (1978) (amputation of both gangrenous legs constituting a significant bodily intrusion) and John F. Kennedy Memorial Hospital v. Heston, 58 N.J.Supr. 576, 279 A.2d 670 (1971) (the forcing of a patient to submit to a blood transfusion), the court in Matter of Quinlan, supra, noting that:
"We glean from the record here that physicians distinguish between curing the ill and comforting and easing the dying: that they refuse to treat the curable as if they were dying or ought to die, and that they have sometimes refused to treat the hopeless and dying as if they were curable."
However, while there is medical recognition of the right of a sapient and sentient patient to refuse extraordinary treatment, when a patient is in an apparently non-reversible vegetative state as here, the distinction between ordinary and extraordinary medical treatment becomes blurred, there being no known medical treatment which would return Mrs. Severns to a sentient and sapient state. In other words, all that the medial profession and its facilities can do for Mrs. Severns is to keep her alive in a vegetative state, a type of life which she does not want to endure, it being clear that the resort to a respirator, the insertion of a tube in her trachea, the administering of drugs such as antibiotics, and the application of code blue procedures in her case will not restore the damage which Mrs. Severns has suffered. Compare In re Dinnerstein, Mass.App., ___ Mass. ___, 380 N.E.2d 134 (1978), in which declaratory relief was granted in the form of an order barring the use of a code blue procedure in the case of an elderly woman suffering from Alzheimer's disease and living in a vegetative state, it being clear to the court that the use of the resuscitative measures which the court ordered discontinued would *160 not enable the patient to recover from the disease with which she was afflicted.
Of the relief sought, the Attorney General seriously contests only the denial of antibiotics to Mrs. Severns in the event of her contracting a respiratory illness or the like, arguing that this type of medicine must be administered in such an emergency. In other words, it is contended that antibiotics, being allegedly an ordinary means of preserving life, such should be administered in an emergency. However, whether a particular medical technique is to be deemed ordinary or extraordinary treatment in the case of a patient such as Mrs. Severns, it will not serve to cure the condition from which Mrs. Severns suffers. On the other hand, the patient's wish expressed through her guardian is clear. If the use of the medical process in question will not return her to a cognitive, sapient condition, she does not want it administered.
Dr. Gibbs, Mrs. Severns' physician, testified that in the absence of protection in the form of an order of this Court, he would see to it that in an emergency that Mrs. Severns be returned to a respirator, that appropriate drugs be administered to her when indicated and that any other appropriate life prolonging procedure be followed in a life threatening situation. This Court, however, should not grant a declaratory judgment which will not be carried out and does not intend to.
As a general rule, the Court of Chancery is without jurisdiction to enjoin the enforcement of criminal laws. Economy Cleaners v. Green, Del.Ch., 184 A. 225 (1936). This rule is based on the premise that the legal remedy will ordinarily be adequate to protect the defendant. However, exceptions exist to the general rule. Thus, as stated in the cited case:
"[t]here is an exception to it when criminal proceedings are instituted by a party to a suit already pending in equity to try the same right that is there in issue."
Bad faith prosecution has been defined as a prosecution brought without reasonable expectation of obtaining a solid conviction, Crusader Enterprises, Inc. v. Massage Establishments and Adult Bookstores, Del.Ch., C.A. 5603 (September 5, 1979). For the Attorney General to prosecute a party to this suit or one relying on the Court's order following the issuance of this declaratory judgment would be a classic case of bad faith prosecution. Thus, anyone acting pursuant to this Court's order would appear to have a defense under the provisions of 11 Del.C. § 462 in any criminal prosecution, which the Attorney General acknowledges. Thus, for the Attorney General to threaten to prosecute despite this admission would be bad faith per se, and a prosecution brought in bad faith may be enjoined, Kugler v. Hefant, 421 U.S. 117, 95 S.Ct. 1524, 44 L.Ed.2d 686 (1976) and Crusader Enterprises, Inc. v. Massage Establishments and Adult Bookstores, supra, and the case of Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), which is concerned with the inappropriateness of the enjoining by a federal court of a pending state criminal action, is not persuasive. Finally, the judicial restraint which is to be exercised when enjoining state criminal proceedings, is, as noted above, limited to good faith prosecutions, Younger v. Harris, supra.
I conclude that the prospective guardian's request for authorization to discontinue all medical supportive measures designed to keep Mrs. Severns alive in a comatose state, a request in which he is joined by all immediate members of the Severns family, should be granted. In other words, those having the care of Mrs. Severns are not to return her to a respirator in order to sustain her breathing, are not to administer antibiotic drugs in the event of a pulmonary infection or the like, and a feeding tube is not to be inserted in her trachea. Furthermore, a no code blue order is to be posted on her medical chart, and finally no drugs or medicines are to be administered to Mrs. Severns other than those normally used to preserve bodily hygiene, particularly for the prevention or cure of constipation or diarrhea.
*161 In light of the possible consequences of the relief here sought and granted, the guardian to be asks this Court to enter an order enjoining criminal prosecution as well as the pursuit of civil liability and the bringing of disciplinary action against any person who may rely on the order here to be granted. I believe this Court has the power in effectuating its order to enjoin civil and disciplinary action filed in defiance of such order, In re Eichner, 423 N.Y.S. 580 (1979). Finally, insofar as the enjoining of criminal liability is concerned, I find the statement of the law made in the case of In re Quinlan, to be persuasive here. It reads as follows:
"The termination of treatment pursuant to the right of privacy is, within the limitations of this case, ipso facto lawful. Thus, a death resulting from such an act would not come within the scope of the homicide statutes proscribing only the unlawful killing of another. There is a real and in this case determinative distinction between the unlawful taking of the life of another and the ending of artificial life-support systems as a matter of self-determination.
"Furthermore, the exercise of a constitutional right such as we have here found is protected from criminal prosecution. See Stanley v. Georgia, supra, 394 U.S. at 559, 89 S.Ct. at 1245, 22 L.Ed.2d at 546. We do not question the State's undoubted power to punish the taking of human life, but that power does not encompass individuals terminating medical treatment pursuant to their right of privacy. See id. at 568, 89 S.Ct. at 1250, 22 L.Ed.2d at 551. The constitutional protection extends to third parties whose action is necessary to effectuate the exercise of that right where the individuals themselves would not be subject to prosecution or the third parties are charged as accessories to an act which could not be a crime. Eisenstadt v. Baird, supra, 405 U.S. at 445-46, 92 S.Ct. at 1034-35, 31 L.Ed.2d at 357-58; Griswold v. Connecticut, supra, 381 U.S. at 481, 85 S.Ct. at 1679-80, 14 L.Ed.2d at 512-13. And, under the circumstances of this case, these same principles would apply to and negate a valid prosecution for attempted suicide were there still such a crime in this State."
The application for the award of a fee made by counsel for Mrs. Severns will be considered in a separate opinion.
An order in conformity with the above, which should also provide for the appointment of William H. Severns as guardian of the person of his wife, Mary Reeser Severns, may be submitted, which form of order should be drawn so as to apply to the institution and persons now charged with the care of Mrs. Severns.