*In re* MARTIN

Docket Nos. 161299, 161431. Submitted May 7, 1993, at Lansing. Decided July 19, 1993, at 10:00 A.M.

Mary Martin, as guardian of and conservator for her husband, Michael Martin, a legally incapacitated person, petitioned the Allegan County Probate Court for authorization for the withdrawal of life-sustaining medical treatment from Michael, including nutrition. Leeta M. Martin and Patricia Major, Michael's mother and sister, opposed the petition and filed a petition for the removal of Mary as Michael's guardian and conservator. The court, George A. Greig, J., denied both petitions, enjoined Leeta and Patricia from interfering with Michael's medical treatment, and denied Leeta and Patricia's request for attorney fees from Michael's estate in excess of the $20,000 agreed to by the parties. Mary appealed, and Leeta and Patricia appealed. The appeals were consolidated.

The Court of Appeals *held:*

1. The common-law doctrine of informed consent accords a competent adult the right to refuse life-sustaining medical treatment. When faced with a dispute concerning a decision to withhold or withdraw life-sustaining medical treatment, the first task of the trial court is to determine whether the patient has the requisite capacity to make the decision. If the patient is found to be competent, then the expressed statements of the patient regarding treatment generally will control the patient's care. If the court finds the patient to be incompetent, it must consider whether there is clear and convincing evidence of the patient's previously expressed desires regarding life support under the given circumstances. If such evidence is lacking, the patient's surrogate decisionmaker may be allowed to consent to the withholding or withdrawal of treatment where there is some trustworthy evidence that the patient would have refused

REFERENCES

Am Jur 2d, Death, §§ 639, 643, 654, 669.

Patient's right to refuse treatment allegedly necessary to sustain life. 93 ALR3d 67.

Mental competency of patient to consent to surgical operation or medical treatment. 25 ALR3d 1439.

the treatment and that the burdens of prolonged life outweigh its benefits. Absent trustworthy evidence that the patient would have refused treatment, the surrogate decisionmaker may be allowed to consent to the withholding or withdrawal of treatment if doing so would serve the patient's best interests.

In this case, the probate court's findings of fact and conclusions of law were not sufficiently specific to allow this Court to review whether Michael was competent to decide whether treatment should be withdrawn, whether Michael had expressed a desire not to be administered life-sustaining treatment under the given circumstances, or whether life-sustaining treatment should be withdrawn under the "substituted judgment" or "best interests" standards. The case must be remanded for such findings of fact and conclusions of law.

2. The probate court erred in denying the petition for the removal of Mary as Michael's guardian and conservator when it failed to conduct a hearing into her suitability as guardian and conservator in light of allegations of possible bias, prejudice, conflict of interest, and improper motive. On remand, the probate court must conduct a hearing and allow Leeta and Patricia to seek jury determinations of disputed facts where permitted by MCL 600.857(1); MSA 27A.857(1).

3. Leeta and Patricia, as Michael's mother and sister, are proper participants in the proceeding to determine his medical treatment.

4. Reasonable attorney fees incurred by Leeta and Patricia may be charged against Michael's estate because Michael was and will be benefited by their efforts to ensure that his condition, intentions, and best interests are fully considered and protected. On remand, the probate court must determine the reasonableness of such attorney fees. Leeta and Patricia, in agreeing to receive $20,000 from Michael's estate as attorney fees, did not agree to forgo any claims for attorney fees beyond that amount.

5. The probate court abused its discretion in issuing an injunction against Leeta and Patricia, prohibiting them from interfering with Michael's treatment, in the absence of a showing of real and imminent danger of irreparable injury.

Remanded.

1. Courts — Withholding or Withdrawal of Life-Sustaining Treatment — Competence of Patient.

A court, in considering a petition for the withholding or withdrawal of life-sustaining medical treatment from an adult, must determine whether the patient is competent to make a

decision regarding such treatment; if competent, the patient's expressed statements regarding treatment generally control; if the patient is not competent, the court must consider and give effect to any clear and convincing evidence of the patient's previously expressed desires regarding life-sustaining medical treatment under the given circumstances; in the absence of such evidence, the patient's surrogate decisionmaker may be allowed to consent to the withholding or withdrawal of treatment where there is some trustworthy evidence that the patient would have refused treatment and that the burdens of prolonged life outweigh its benefits; absent such trustworthy evidence, the surrogate decisionmaker may be allowed to consent to the withholding or withdrawal of treatment if doing so would serve the patient's best interests.

2. COURTS — WITHHOLDING OR WITHDRAWAL OF LIFE-SUSTAINING TREATMENT — COMPETENCE OF PATIENT.

The test for determining if a person has the requisite capacity to make a decision concerning the withholding or withdrawal of life-sustaining medical treatment is whether the person has sufficient mind to reasonably understand the condition, is capable of understanding the nature and effect of the treatment choices, is aware of the consequences associated with those choices, and is able to make an informed choice that is voluntary and not coerced; special care must be taken to ensure that sufficient information has been provided to enable the patient to make an informed choice.

*Vlcko, Lane, Payne & Broder, P.C.* (by *Andrew J. Broder* and *Lynn Stevens Naoum*), for Mary Martin.

*Hess & Hess, P.C.* (by *John H. Hess* and *Daniel B. Hess*), for Leeta M. Martin and Patricia Major.

Amici Curiae:

*Kerr, Russell & Weber* (by *Richard D. Weber* and *Joanne Geha Swanson*), for Michigan State Medical Society.

*Van Dam & Jesson, P.C.* (by *Theresa K. Phelps*), and National Legal Center for the Medically De-

pendent and Disabled, Inc. (by *James Bopp, Jr., Thomas J. Marzen, Daniel Avila,* and *John Altomare*), for Ethics and Advocacy Task Force of the Nursing Home Action Group.

Before: WAHLS, P.J., and SHEPHERD and CAVANAGH, JJ.

SHEPHERD, J. In these consolidated appeals, petitioner Mary Martin and respondents Leeta Martin and Patricia Major appeal as of right from a November 12, 1992, order of the Allegan County Probate Court, which, following a hearing, denied Mary Martin's petition as guardian of Michael Martin (her spouse) for authority to withdraw all artificial means of life support from Michael, including nutritive support, and also denied respondents' petition to have Mary Martin removed as guardian of and conservator for Michael. Respondents also appeal a February 3, 1993, injunction prohibiting them from interfering in the medical treatment of Michael and a separate order denying their request for attorney fees. We remand for further proceedings consistent with this opinion.

Petitioner and Michael Martin were married in 1972 and thereafter had three children. On January 16, 1987, Michael sustained debilitating injuries in an automobile accident, with the most serious being a closed head injury affecting the bilateral hemisphere of his brain. The injuries significantly impaired his physical and cognitive abilities, left him unable to walk or talk, and rendered him dependent on a colostomy for defecation and a gastrostomy tube for nutrition. Petitioner was appointed Michael's legal guardian and conservator. Michael resided at different nursing homes for the first few years after the accident until July 1990, when he was transferred to the

New Medico Neurological Center (NMNC) in Howell, Michigan, where he was still residing at the time of the hearing.

On January 9, 1992, while Michael was being treated at Butterworth Hospital for an obstructed bowel, petitioner contacted the hospital's bioethics committee for the purpose of determining whether Michael's life-sustaining medical treatment should be withdrawn. On January 15, 1992, after consulting with petitioner, a family friend, a social worker, Michael's treating physician, and nurses at Butterworth Hospital, the committee issued a report stating that withdrawal of Michael's nutritive support was both medically and ethically appropriate, but that court authorization would be required before the hospital would assist in the procedure. None of the personnel at the NMNC and no other members of Michael's family were consulted or notified by the committee.

On March 19, 1992, petitioner filed a petition in the probate court, requesting authorization to withdraw Michael's nutritive support. Respondents Leeta Martin and Patricia Major, who are Michael's mother and sister respectively, opposed the petition and also filed a petition of their own asking that Mary Martin be removed as Michael's guardian and conservator. An evidentiary hearing was held from October 13, 1992, through October 30, 1992, regarding the petition for authority to withdraw Michael's nutritive support.

Petitioner said that Michael was a private but active person before the accident. She claimed that he was always bothered by, and intolerant of, people who were disabled or dependent on others and often stated that he would rather die than be dependent on people and machines. According to petitioner, Michael would not want to be kept alive in his present condition. Two co-workers of

Michael each testified that he had remarked to them before the accident that he would not want to continue living in a vegetative state. The remark was made to one of the co-workers during a casual conversation around the lunch table and to the other while discussing someone else who had been severely injured. Both co-workers testified that Michael's present condition is not the type Michael was referring to in the conversations before his accident. Respondent Patricia Major admitted that Michael once told her that he would not want to be kept alive by a respirator if he were in a coma.

Conflicting testimony was presented regarding Michael's current level of physical, sensory, emotional, and cognitive functioning. At one extreme, Dr. Joseph Fischhoff, who is head of the Department of Psychiatry at Wayne State University and the chairman of the bioethics committee at Children's Hospital in Detroit, testified that Michael has no voluntary control over any of his limbs, or any ability to function on a voluntary level, and therefore lacks any meaningful interaction with his environment. However, Dr. Robert Kreitsch, who is the director of the Brain Injury Rehabilitation Program at the Mary Free Bed Rehabilitation Center, testified that Michael demonstrated an ability to carry out some voluntary motor commands on his right side, including the ability to pinch and grasp, as well as the ability to recognize faces, respond emotionally, and communicate with others with head nods. According to Dr. Kreitsch, Michael seemed content with his environment and indicated "no" with a head nod when asked whether he has been in any pain or discomfort, and also when asked if there were ever any times when he felt that he did not want to go on living. Other medical experts also presented differing

opinions regarding Michael's level of functioning, but generally described it as falling somewhere between that described by Drs. Fischhoff and Kreitsch. All medical experts agreed that Michael was not in a persistent vegetative state or terminally ill.

Petitioner, several therapists from the NMNC, and several lay witnesses all described an apparent limited ability by Michael to interact with others and to respond to simple yes or no questions with head nods; their testimony varied, however, with respect to the consistency and appropriateness of the perceived interaction and responses. The trial judge personally visited and questioned Michael at the NMNC on October 14, 1992. The judge explained on the record how Michael had moved both his right arm and right leg on command, and how he had responded with appropriate head nods to a series of yes or no questions. Witnesses also testified that there are times when Michael becomes completely withdrawn and does not respond to any stimuli.

In a decision delivered from the bench on October 30, 1992, the trial court ruled that clear and convincing evidence had been presented that Michael did not want to be "kept a dependent person" and that his present condition "falls within what Michael did not want to be." Nonetheless, the court held that Michael's intentions could not be considered because they were not expressed in writing. The trial court further ruled that withdrawal of nutritive support was in Michael's best interests, but that, absent being terminally ill, a best interests standard could not be applied as a matter of law. Accordingly, the trial court denied the petition for authority to withdraw Michael's nutritive support. The trial court then proceeded to also deny respondents' petition for removal of

Mary Martin as Michael's guardian and conservator. The court concluded that her "decision-making process" relative to the decision to withdraw life-sustaining medical treatment was not inappropriate. Motions for reconsideration brought by both sides, including a request by respondents for specific factual findings, were thereafter denied.

I

A

This Court recently held in *In re Rosebush,* 195 Mich App 675, 681-682; 491 NW2d 633 (1992), that a competent adult patient has the right to refuse life-sustaining medical treatment as an aspect of the common-law doctrine of informed consent and that such right is not lost because of the subsequent incompetence of the patient.[1] The Court stated that where a patient lacks the capacity to make a decision concerning medical treatment, a surrogate decisionmaker may exercise the right to refuse treatment by applying either a "substituted judgment" or a "best interests" standard, whichever is appropriate. *Id.* at 688-690. We agree with these principles but expand upon them further.

Because a patient's right of self-determination is generally recognized as outweighing any countervailing state interests, where a patient currently has the requisite decision-making capacity, the expressed statements of the patient regarding

---

[1] As other states have recognized, cases involving treatment by artificial feeding versus other forms of life-sustaining medical procedures are considered the same. See *In re Conroy,* 98 NJ 321, 372-373; 486 A2d 1209 (1985). See also *In re Drabick,* 200 Cal App 3d 185; 245 Cal Rptr 840 (1988); *In re Severns,* 425 A2d 156, 160 (Del Ch, 1980); *In re Guardianship of Browning,* 568 So 2d 4, 17 (Fla, 1990); *In re Longeway,* 133 Ill 2d 33, 45; 549 NE2d 292 (1989); *In re Gardner,* 534 A2d 947 (Me, 1987); *Brophy v New England Sinai Hosp, Inc,* 398 Mass 417; 497 NE2d 626 (1986); *In re Guardianship of Grant,* 109 Wash 2d 545; 747 P2d 445 (1987).

medical treatment will generally control that patient's care, regardless of the consequences of the decision. *Rosebush, supra* at 681, n 2, 688. Cf. *Cruzan v Director, Missouri Health Dep't,* 497 US 261, 279; 110 S Ct 2841; 111 L Ed 2d 224 (1990).

Likewise, where a patient has lost the requisite decision-making capacity, it is still the goal to effectuate the patient's right of self-determination. *In re Conroy,* 98 NJ 321, 380-381; 486 A2d 1209 (1985); *Guidelines for State Court Decision Making in Authorizing or Withholding Life-Sustaining Medical Treatment* (Williamsburg, Va: National Center for State Courts, 1991), p 60. Accordingly, courts have generally recognized, and we agree, that where a formerly competent patient lacks the requisite capacity to make a decision regarding the withholding or withdrawal of life-sustaining medical treatment, such treatment may be withheld or withdrawn upon proof by clear and convincing evidence of the patient's previously expressed medical preference to decline treatment under the circumstances presented.[2] *In re Guardianship of Browning,* 568 So 2d 4 (Fla, 1990); *In re Longeway,* 133 Ill 2d 33; 549 NE2d 292 (1989); *In re Gardner,* 534 A2d 947 (Me, 1987); *In re Peter,* 108 NJ 365;

---

[2] The panel in *Rosebush, supra* at 688, n 7, "summarily reject[ed]" adoption of a standard based on the presence of clear and convincing evidence of a formerly competent patient's decision, made while competent, to forgo life-sustaining medical treatment under similar circumstances. However, because *Rosebush* did not involve a patient who was formerly competent, consideration of whether such a standard should be adopted as applied to a formerly competent patient was not essential to the determination of that case. Accordingly, the *Rosebush* panel's discussion of that standard is dicta and a rule of law to which Administrative Order No. 1990-6 applies was not established. *People v Cooke,* 194 Mich App 534, 538; 487 NW2d 497 (1992). Because we are free to do so, we disagree with the conclusion in n 7 of *Rosebush* that adoption of a rule that evidence of the clearly expressed wishes of a previously competent patient may be used in the case of a now incompetent patient would preclude termination of life-support efforts for minors or others who have never been competent. One set of circumstances has nothing to do with the other. We address below the proper standards that apply in all cases.

529 A2d 419 (1987); *In re O'Connor,* 72 NY2d 517; 531 NE2d 607 (1988); *Conroy, supra.*

In the absence of clear and convincing evidence of the patient's actual preferences concerning medical treatment under the circumstances, a decision whether to withhold or withdraw consent to life-sustaining medical treatment may be exercised by a surrogate decisionmaker applying the "substituted judgment" or the "best interests" standard articulated in *Rosebush.* Under the substituted judgment standard, a surrogate decisionmaker may consent to the withholding or withdrawal of life-sustaining medical treatment where there is some trustworthy evidence that the patient would have refused the treatment at issue and the burdens of prolonged life outweigh the benefits. *Rosebush, supra* at 688-689. Under the best interests standard, if there is no trustworthy evidence that a formerly competent patient would have declined treatment, then a surrogate decisionmaker may still consent to the withholding or withdrawal of life-sustaining medical treatment if doing so would serve the patient's best interests. *Rosebush, supra* at 689-690. A nonexclusive list of factors that should be considered in making a best interests determination is set forth in *Rosebush* at 690. Although the trial court here held that a best interests standard may not be applied as a matter of law to a patient who is not terminally ill, such a rule is not required by *Rosebush,* nor do we adopt such a rule ourselves. Rather, whether a patient is terminally ill would merely be considered as a factor in determining whether the withholding or withdrawal of life-sustaining medical treatment serves the patient's best interests.

It is apparent from this analysis that the trial court is to consider the various standards in the following sequence:

1. Whether there is clear and convincing evidence of the patient's previously expressed desires regarding life support under the conditions in which the court finds the patient to be.

2. If such evidence is not clear and convincing, the court may use the substituted judgment test as defined in *Rosebush.*

3. Only if the evidence in the first two categories does not yield a result may the court move on to consider a pure best interests standard. (Obviously, steps 2 and 3 also apply to minors and others who have never been competent.)

The logic of this sequential analysis is rooted in the fact that, as we progress from one step to the next, we are moving away from deferring to the wishes of the patient to the point where we allow others (fiduciaries, family members, ethics committees, and courts) to decide whether the patient will live or die without reference to the patient's wishes. Our premise is that this should not be permitted except as a last resort, given society's reverence for life and its acknowledgment that patients have an inherent right of self-determination. Nevertheless, we may not eliminate the third stage because to do so would be to hold that where the patient is incompetent, never expressed a preference, and the court cannot determine what the patient would do under existing circumstances, life support may never be withdrawn. That is not the current state of the law.

We also disagree with the trial court's conclusion in this case that a person's medical treatment preferences must be expressed in writing. While a writing would be preferable, it is invariably recognized by other states that other evidence tending to demonstrate a person's intent with respect to medical treatment, including oral statements, may

constitute sufficient evidence of intent. *In re Guardianship of Browning, supra; In re O'Connor, supra; In re Conroy, supra; In re Guardianship of Ingram,* 102 Wash 2d 827; 689 P2d 1363 (1984); *Guidelines for State Court Decision Making, supra* at 80-81. Moreover, our Legislature has enacted the patient advocacy statute, MCL 700.496; MSA 27.5496, which allows a competent adult to designate a patient advocate to make medical treatment decisions, including the withholding or withdrawal of life-sustaining medical treatment. Subsection 9(b) of that statute provides that a patient advocate shall take reasonable steps to follow the desires or instructions of a patient made while competent, "whether given *orally* or as written." We believe this statute reflects the policy of this state that evidence of a patient's medical treatment preferences need not be in writing.[3]

As this Court observed in *Rosebush, supra* at 687, judicial involvement in a decision to withhold or withdraw life-sustaining medical treatment generally is not required where there is no disagreement about treatment among the parties directly concerned. Where, however, judicial involvement becomes necessary, the task of the trial court is to ensure that the standards established by law are followed. See *Guidelines for State Court Decision*

---

[3] A nonexclusive list of factors that may be considered in evaluating the weight and probative value of other evidence of a person's medical treatment preferences include: the remoteness, consistency, and thoughtfulness of the person's prior statements or actions; the maturity or emotional state of the person at the time of the statements or acts; the specificity of prior statements, including details about the level of impaired functioning or the forms of treatment one would find tolerable; the circumstances under which prior expressions of intent were made; and the similarity between the expressed treatment preference and the current or proposed treatment. Additionally, an understanding of the patient's present medical condition, treatment, and prognosis is necessary in order to determine whether the present circumstances conform to those contemplated by the patient at the time of the prior statements or acts. See *Conroy, supra* at 363-364; *Guidelines for State Court Decision Making, supra* at 82.

*Making, supra* at 71. It is important for the trial court to make findings of fact and conclusions of law with sufficient specificity to allow this Court to review the trial court's determination and ascertain why the trial court made the decision it did and whether that decision was correct. See *Eyde Bros Development Co v Roscommon Co Bd of Drain Comm'rs,* 161 Mich App 654, 673; 411 NW2d 814 (1987). Findings of fact made by the trial court are subject to review under the clearly erroneous standard. See *In re Cornet,* 422 Mich 274, 277-278; 373 NW2d 536 (1985).

B

When faced with a dispute concerning a decision to withhold or withdraw life-sustaining medical treatment, the first task of the trial court is to determine whether the patient has the requisite capacity to make the decision in question. *In re A C,* 573 A2d 1235, 1247 (DC App, 1990); *Conroy, supra,* at 382. The fact that a patient previously has been adjudicated incompetent is not controlling. As other states have recognized, a patient may not be competent to make some decisions, but still have the requisite capacity to make a decision regarding medical treatment. *Conroy, supra* at 381; See also *In re Hier,* 18 Mass App 200; 464 NE2d 959 (1984); *In re Guardianship of Ingram, supra; Guidelines for State Court Decision Making, supra* at 54-55. Indeed, this view is embodied in this state's patient advocacy statute, MCL 700.496(13); MSA 27.5496(13), which explicitly recognizes that an incompetent patient may express a current desire not to have life-sustaining medical treatment withheld or withdrawn.

The test for determining if a person has the requisite capacity to make a decision concerning

the withholding or withdrawal of life-sustaining medical treatment is whether the person (1) has sufficient mind to reasonably understand the condition, (2) is capable of understanding the nature and effect of the treatment choices, (3) is aware of the consequences associated with those choices, and (4) is able to make an informed choice that is voluntary and not coerced. *Conroy, supra* at 382; *Guidelines for State Court Decision Making, supra* at 55-56. Special care must be taken to ensure that sufficient information has been provided to enable the patient to make an informed choice. *Id.* The proof must be clear and convincing that the patient does not have and will not regain the capability of making the decision. *Conroy, supra.*

In this case, conflicting evidence was presented regarding Michael's physical and cognitive abilities. Moreover, while some witnesses questioned Michael's ability to understand, communicate, and interact with others, several other witnesses testified that he has demonstrated an ability to understand and respond appropriately to certain questions, although there was some disagreement regarding his capacity and level of understanding and the consistency and appropriateness of his responses. The record does not indicate that there was ever any concerted effort to specifically inform Michael of the nature and purpose of the proceedings or to ask him specifically what his treatment preferences might be.

Regarding the issue of Michael's decision-making capacity, the trial court simply stated that he was not competent to decide. Unfortunately, the trial court's generalized finding of incompetency does not enable us to determine whether it properly resolved the issue of Michael's capacity to decide his own treatment. The trial court failed to issue specific findings reflecting consideration of

the various factors for assessing a person's capacity to decide questions of medical treatment, and we cannot determine whether these factors were actually considered and, if so, how they were resolved.

As this Court explained in *Nicpon v Nicpon,* 9 Mich App 373, 377-378; 157 NW2d 464 (1968):

> An appellate court's primary function in regard to fact finding is review of the trial court's record and determination whether that record supports the trial court's findings. It is not the function of an appellate court to decide disputed questions of fact in the first instance and then choose between affirmance or reversal by testing its factual conclusion against that which the trial court *might* have . . . reached. [Emphasis in original.]

We will not speculate with respect to how the trial court arrived at its generalized finding of incompetency or what that finding entails. Therefore, we find it necessary to remand for further and more specific findings of fact and conclusions of law regarding Michael's decision-making capacity consistent with the legal principles discussed herein. Moreover, given the importance of this issue and to ensure a proper basis for decision, the parties shall be permitted the opportunity to present additional evidence specifically addressing the various factors applicable to a determination of Michael's decision-making capacity. The parties may also request, or the trial court on its own may order, additional medical and psychological testing of Michael. Consideration of any newly presented evidence shall be reflected in the trial court's new findings of fact and conclusions of law.

We also find inadequate the trial court's findings of fact as they relate to its rulings regarding Michael's medical treatment preferences and his

best interests. Indeed, despite the wide range of
testimony, the trial court issued no findings what-
soever detailing Michael's present condition or his
present level of physical, sensory, emotional, and
cognitive functioning. Absent any indication of
what the trial court believed Michael's present
condition and level of functioning to be, or what
types of evidence it considered as clear and con-
vincing evidence of his medical treatment prefer-
ences under the circumstances, we simply are
unable to determine whether the trial court cor-
rectly decided these matters. Accordingly, we di-
rect the trial court to reevaluate these matters in
light of the legal principles discussed herein and to
issue specific findings of fact and conclusions of
law to enable this Court to ascertain the basis for
any decision reached and whether that decision
was correct.[4]

II

We agree that the trial court erred in denying
respondents' petition for removal of Mary Martin
as Michael's guardian and conservator without
having held a hearing for the purpose of inquiring
into her suitability as guardian and conservator.
As the court in *Conroy, supra* at 383, stated:

> [T]he court should determine whether [the]
> guardian is a suitable person to represent the
> patient with respect to the medical decision in

---

[4] We recognize that consideration of a patient's prior medical treat-
ment preferences or an application of the substituted judgment or
best interests standards is neither necessary nor proper until it has
first been determined that the patient lacks the requisite decision-
making capacity, a determination that we are unable to make at the
present time. Our purpose in remanding for additional findings of fact
and conclusions of law regarding these issues is to ensure the expedi-
ent resolution of this case in the event consideration of these issues
becomes necessary.

question. Such a determination necessitates an inquiry into the guardian's knowledge of the patient and motivations or possible conflicts of interest.

Accordingly, as part of the proceedings on remand, the trial court shall conduct a hearing regarding respondents' petition for removal. The evidence that respondents attempted to offer below concerning the issues of possible bias, prejudice, conflict of interest, or improper motive on the part of petitioner, but which was not admitted, shall be considered at the hearing. We make no comment regarding the admissibility of any specific evidence.

Regarding respondents' claim that they are entitled to a jury determination of their petition for removal, we find that the authority they cited does not support their claim.[5] We note, however, that MCL 600.857(1); MSA 27A.857(1) provides for the right to a jury determination in the probate court of a particular issue of fact if a party would have had a right to demand a jury to determine that issue of fact in the circuit court upon an appeal de novo from a probate proceeding before January 1, 1971. In *In re Bristol,* 199 Mich 453, 456; 165 NW 819 (1917), which involved an appeal from a circuit court proceeding on appeal from the probate court, our Supreme Court stated that a proceeding involving considerations of the propriety of a guardian's actions is an equitable one for the court to

---

[5] Moreover, respondents' suggestion that they have a constitutional right to a jury trial is incorrect. Because the constitutional provisions relating to the right to a jury trial, US Const, Am VII; Const 1963, art 1, § 14, extend only to cases where a right to a jury trial existed before the adoption of the constitutions, and because probate courts previously proceeded without a jury, there is no constitutional right to a jury trial in the probate court. See *Conservation Dep't v Brown,* 335 Mich 343, 346; 55 NW2d 859 (1952); *Ward v Booth,* 197 F2d 963, 966 (CA 9, 1952); 50 CJS, Juries, § 13, p 727.

decide, but that "[m]atters of fact which are disputed may be submitted on proper issues to a jury to determine definitely such specific facts as will, when found, aid the court in determining questions which belong to its equitable discretion."

Respondents here do not address the applicability of MCL 600.857(1); MSA 27A.857(1) or identify any "specific facts" in dispute. On remand, any properly preserved request by respondents for a jury determination in connection with their petition for removal shall be resolved in accordance with MCL 600.857(1); MSA 27A.857(1).[6]

### III

It was suggested below that respondents are not proper participants in the proceeding to determine whether Michael's nutritive support should be withdrawn. We disagree. In *Rosebush, supra* at 687, this Court stated that a party "directly concerned" is a proper participant in a judicial proceeding involving disagreement over medical treatment decisions. In *In re Jobes,* 108 NJ 394, 415, 417; 529 A2d 434 (1987), it was observed that a patient's parent or sibling normally will be considered a proper participant in such a proceeding because such persons invariably are familiar with the patient's attitudes and intentions with respect to medical treatment. In this case, we are satisfied that respondents have standing to participate in these proceedings.

### IV

Respondents also argue that the trial court

---

[6] Although petitioner argues that any entitlement respondents might have to a jury determination was not properly preserved, see MCR 5.508, we do not address that issue because it was not raised and addressed below. *Hunters Pointe Partners Ltd Partnership v United States Fidelity & Guaranty Co,* 177 Mich App 745, 750-751; 442 NW2d 778 (1989).

erred in denying their request for attorney fees to be charged against Michael's estate. Petitioner argues that the trial court properly denied the request because a pretrial order reflects an agreement to limit respondents' recovery of attorney fees to $20,000, which they already received.

While the pretrial order reflects that petitioner, as Michael's guardian and conservator, agreed to pay reasonable attorney fees incurred by respondents up to $20,000, it does not reflect that respondents agreed to forgo any claim they might have to recover additional fees. Hence, we do not view the agreement as restricting the trial court's discretion to award additional attorney fees to the extent respondents would be entitled to recover such fees. We do not interpret the agreement that no fees in excess of $20,000 will be paid without advance approval of the court to mean that the *services* must be approved before they are performed. It is only payment that must be approved before the disbursement of funds. It would be inequitable for a court to allow extensive hearings to take place and then deny payment on the basis that the attorneys who appeared at the hearing did not obtain a prior order to prepare and argue the case.

Generally, attorney fees are not recoverable as an element of costs or damages unless expressly allowed by statute, court rule, or judicial exception. *Brooks v Rose,* 191 Mich App 565, 574-575; 478 NW2d 731 (1991).

In *Becht v Miller,* 279 Mich 629, 638; 273 NW 294 (1937), our Supreme Court held that attorney fees incurred by a party not acting as a fiduciary may properly be charged against a decedent's estate under certain circumstances:

[A]s a general proposition it may be stated that

before such an item may be charged against the estate it must be shown that the services rendered were beneficial to the estate as a whole rather than to an individual or group of individuals interested therein.

This rule has been extended to guardianship cases to allow the estate of a ward to be charged with reasonable attorney fees incurred by a nonfiduciary where the ward's estate is benefited. *In re Valentino Estate,* 128 Mich App 87, 96; 339 NW2d 698 (1983).

In this case, conflicting evidence exists regarding Michael's wishes and physical and mental condition. Under the circumstances, we believe that Michael can be said to derive a benefit from a proceeding designed to ensure that his present capacity to decide his own medical treatment is fully explored and, in the event it is determined that he lacks the requisite decision-making capacity, that his medical treatment preferences or best interests are likewise fully and adequately considered and protected. This is particularly so where an erroneous determination will result in the termination of Michael's life against his wishes or best interests. We believe, therefore, that the rationale of *Becht* and *In re Valentino* is applicable to the case at hand and allows Michael's estate to be charged with reasonable attorney fees incurred by respondents in their efforts to ensure that Michael's condition, intentions, and best interests are fully considered and protected. Were we to hold otherwise, we would be saying that attorneys who advocate the termination of Michael's life may be paid for all their reasonable services out of his estate but those who advocate keeping him alive may not.

Accordingly, we hold that reasonable attorney

fees incurred by respondents may be charged against Michael's estate in an amount to be determined following a hearing regarding the question of reasonableness. *In re Humphrey Estate,* 141 Mich App 412, 439; 367 NW2d 873 (1985); *In re L'Esperance Estate,* 131 Mich App 496, 501; 346 NW2d 578 (1984).

v

Respondents also challenge a February 3, 1993, injunction issued by the trial court prohibiting them from interfering in Michael's medical treatment and assessing costs in the amount of $675. The injunction was issued because of a letter sent by respondents' attorney to Butterworth Hospital on December 24, 1992.[7] Injunctive relief is an extraordinary remedy that is granted only when (1) justice so requires it, (2) there is no adequate remedy at law, and (3) there exists a real and imminent danger of irreparable injury. *Lyon Twp v Lazechko,* 197 Mich App 681, 682; 495 NW2d 839 (1992). We find that the trial court abused its discretion in issuing the injunction, and we order it dissolved. Under the circumstances, we do not believe that respondents acted improperly in sending the letter to the hospital. Moreover, there was no showing that the transmission of the letter affected petitioner's dealings with the hospital as Michael's guardian, or that some type of irreparable injury was likely or imminent.

Reversed and remanded for further proceedings consistent with this opinion. Proceedings on re-

---

[7] The letter was sent after respondent Major unexpectedly discovered that Michael had been transferred to the hospital and then found him there in a "depleted" condition with his feeding tube removed. The letter advised the hospital that petitioner, as Michael's guardian, was without court authorization to order the withdrawal of reasonable medical treatment or life support.

mand shall be held within fifty-six days of the release of this opinion, and the trial court shall forward its findings of fact and conclusions of law to this Court within twenty-eight days of the conclusion of the proceedings. The parties may submit supplemental briefs within twenty-eight days of receipt of the trial court's findings of fact and conclusions of law. We retain jurisdiction.