*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MEGHAN MARIE KUEBLER, also known as
MEGHAN MARIE O'NEIL,

       Plaintiff-Appellee,

v

PAUL ANDREW KUEBLER,

       Defendant-Appellant.

FOR PUBLICATION
May 11, 2023
9:00 a.m.

No. 362488
Washtenaw Circuit Court
LC No. 15-002753-DM

Before: BOONSTRA, P.J., and GADOLA and YATES, JJ.

BOONSTRA, P.J.

Defendant appeals by right the trial court's order changing custody of the minor children BK and SK from defendant's sole legal custody to joint legal custody and awarding plaintiff additional parenting time. We vacate the trial court's order and remand for further proceedings consistent with this opinion.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case has a lengthy and contentious history, both in the trial court and in numerous prior appeals to this Court.[1] In an opinion issued in a previous appeal, a panel of this Court summarized the history of the parties' relationship and divorce as follows:

       Plaintiff and defendant married in 2010. Early in their marriage, the parties lived in Connecticut, and they both worked on Wall Street in New York City. Defendant was an investment banker, and plaintiff worked as a statistician. At some point, defendant, who had both a law degree and an MBA, lost his investment job, and he changed careers, switching to law. Plaintiff also changed careers, deciding to pursue a doctorate degree in sociology. The parties moved to

---

[1] In addition to the current appeal, the parties have filed twelve prior appeals to this Court.

-1-

Michigan—despite plaintiff's reluctance—in 2014 when defendant accepted a position in the federal prosecutor's office. Defendant currently works as an assistant United States attorney. Following the parties' divorce, plaintiff finished her doctorate degree at the State University of New York Albany, and she now works at the University of Michigan as a research investigator and research scholar.

The parties have two children together: BK and SK. Plaintiff filed for divorce in November 2015. Eventually, pursuant to a consent judgment of divorce entered on April 21, 2017, defendant received sole physical and legal custody of the children, and plaintiff received supervised parenting time at Catholic Social Services. The reasons for the supervised parenting time were plaintiff's mental-health problems involving manipulation and alienating behavior, such as fabricated ideas of child abuse. The divorce judgment provides that plaintiff "has a serious personality disorder, and serious problems with manipulation that will require much psychotherapeutic effort." The treatment directives in the divorce judgment specified that the long-term goal was for plaintiff to "be able to present believable evidence that her mental health is being properly treated and that she is not endangering the children by the kind of alienating behavior that Defendant reasonably fears. Fabricated ideas of child abuse are dangerous not only to Defendant, but to the minor children's burgeoning self-concept."

The divorce judgment was agreed to after both parties were evaluated by Dr. Pamela Ludolph, Ph.D., a court-appointed psychologist, and Dr. Elissa P. Benedek, M.D., a psychiatrist. Notable to plaintiff's arguments on appeal, Dr. Ludolph diagnosed plaintiff with borderline personality disorder. Dr. Benedek, though not definitively diagnosing borderline personality disorder, also concluded that plaintiff exhibited borderline personality "traits." Undisputedly, plaintiff has a long history of mental-health problems, and she has also been diagnosed with major depressive disorder related to events in late 2014 and early 2015. By the time of the parties' divorce, plaintiff's depression was in remission, but, according to Dr. Ludolph and Dr. Benedek, likely to reoccur. Dr. Ludolph recommended treatment for plaintiff. The divorce judgment expressly incorporated Dr. Ludolph's mental-health determinations and treatment recommendations, including requirements that plaintiff treat with a psychologist, a psychiatrist, and take any medication as prescribed.

With regard to defendant, when evaluating the parties, Dr. Ludolph noted that defendant had problems with anger, and under the divorce judgment, defendant was also ordered to seek mental-health treatment. When evaluating the parties, Dr. Ludolph also considered the parties' respective parenting skills and their relationship with each other, and she opined that, given the acrimonious relationship between the parties, coparenting would be "impossible." In view of the parties' respective strengths and weaknesses, and their inability to coparent, Dr. Ludolph recommended that defendant receive sole physical and legal custody.

As noted, the divorce judgment mentions plaintiff's "alienating behavior" and "fabricated ideas" of child abuse, which everyone agreed can be harmful to

children. In this regard, over the last several years both before and after entry of the divorce judgment, plaintiff has made various complaints about defendant, including allegations of child abuse, all of which defendant denies and none of which have been substantiated. Plaintiff first accused defendant of physically and sexually abusing BK in 2017 during the divorce proceedings. Plaintiff's claims were investigated by police; BK was forensically interviewed; and the claims were not substantiated. Despite her allegations of child abuse, plaintiff, at other times, admitted that the children were "safe" with defendant, including during her testimony at a recent evidentiary hearing.

Plaintiff has also, at various times, accused defendant of domestic violence against her. Since the divorce, plaintiff has more recently filed for, and then withdrawn, requests for personal protection orders (PPOs), she has accused defendant of breaking into her home to steal her passport (which she later found in her house), she has written to the State Bar Commissioner, she has posted about defendant on Facebook, and during a parenting-time visit, she attempted to photograph SK's genital area in an effort to establish that SK had sexually transmitted genital warts when, in actuality, SK had a common childhood condition called "molluscum contagiosum," which is more commonly referred to as "water warts." [See *Kuebler v Kuebler*, unpublished per curiam opinion of the Court of Appeals, issued November 18, 2021 (Docket Nos. 354327, 355934, and 356641, and 356709), pp 2-3.]

In December 2017, plaintiff filed a motion titled as a motion to "move parenting time." Substantively, she sought unsupervised parenting time and a substantial increase in the amount of her parenting time. Plaintiff's basic position was that a change in parenting time was warranted because, contrary to Dr. Ludolph's diagnosis, she did not have borderline personality disorder. She supported this assertion with opinions from a licensed social worker as well as her therapist, Dr. Melody Vaitkus; both opined that she did not have borderline personality disorder. Dr. Philip Saragoza, a psychiatrist, likewise stated that plaintiff did not have borderline personality disorder, although he noted examples of plaintiff "engaging in deceit/manipulation." Following the filing of this motion, the parties engaged in almost three years of litigation, both in the trial court and in multiple appeals to this Court. Ultimately, following an evidentiary hearing, the trial judge, Judge Archie C. Brown, denied plaintiff's motion, concluding that plaintiff had failed to establish proper cause or a change of circumstances to revisit the issue, when plaintiff's manipulative and alienating behavior had not improved but actually "worsened" over time.

Plaintiff sought delayed leave to appeal the trial court's denial, which this Court granted. On appeal, this Court affirmed Judge Brown's decision, detailing at some length plaintiff's behavior, including her fabrications about defendant and her efforts to malign him, and the potentially harmful effects of such behavior on the children. See *id*. at 8-14. This Court focused on plaintiff's observable conduct, recognizing that "[a] particular diagnosis, or lack thereof, does not necessarily make a parent inherently fit or unfit to see his or her children." *Id*. at 13. But, this Court explained, "[i]n this case it was—and remains—plaintiff's manipulative and alienating behavior, including her fabricated allegations of child abuse against defendant, that warranted the supervised parenting-time arrangement provided in the judgment of divorce." *Id*. This Court

issued its previous opinion, resolving the appeals from Judge Brown's orders, on November 18, 2021.

In the meantime, in January 2021, the case was reassigned to Judge Tracy E. Van den Bergh. In March 2021, while appeals in this Court remained pending, plaintiff again moved the trial court to modify custody and parenting time, seeking joint legal and joint physical custody of the children. According to plaintiff's newest motion, the Department of Licensing and Regulatory Affairs, Bureau of Professional Licensing (LARA) had recently filed an administrative complaint against Dr. Ludolph that included allegations that an expert hired by LARA had concluded that Dr. Ludolph's evaluation of plaintiff was professionally incompetent. In her motion, plaintiff argued that the LARA complaint provided grounds for questioning Dr. Ludolph's diagnosis of borderline personality disorder. Because the LARA complaint was filed after the evidentiary hearing before Judge Brown, plaintiff asserted that she could not have presented this information to Judge Brown and that it constituted a new proper cause or change in circumstances.[2]

Following the filing of plaintiff's newest motion, Judge Van den Bergh entered several interim orders changing parenting time and effectively changing custody, without holding an evidentiary hearing and without complying with the procedures in the Child Custody Act, MCL 722.21 *et seq*. First, in April 2021, on the basis of "concern" about Dr. Ludolph's opinions in light of the LARA allegations, and after expressing disagreement with Judge Brown's prior decisions, Judge Van den Bergh removed the supervision restriction on plaintiff's parenting time and substantially increased her parenting time. Judge Van den Bergh also appointed a guardian ad litem (GAL) for the children to investigate the case anew because she wanted "a fresh look at this case." When defendant sought to stay the order modifying parenting time, Judge Van den Bergh denied the request, opining, without an evidentiary hearing, that plaintiff was "stable."[3]

Second, in May 2021, following receipt of an interim report from the GAL—who noted that she had yet to review all the records and materials in this case—Judge Van den Bergh entered

---

[2] In an earlier appeal, plaintiff also sought to attack Dr. Ludolph's credibility with the assertion that LARA had filed an administrative complaint against her. The panel rejected this argument, noting that any findings by LARA were not part of the record before Judge Brown and that collateral LARA proceedings, particularly those conducted after Judge Brown reached his decision, did not establish that Judge Brown's findings were against the great weight of the evidence. *Kuebler*, unpub op at 12. The panel also noted that the consent judgment in this case represented an agreement between the parties as to the facts existing at the time of the divorce, which included plaintiff's acknowledgment of her psychological problems involving manipulative and alienating behavior that posed a danger to the children. *Id*. at 12 n 11, citing *American Mut Liability Ins Co v Mich Mut Liability Co*, 64 Mich App 315, 327; 235 NW2d 769 (1975).

[3] Defendant sought leave to appeal the April 2021 order, but this Court denied the application for failure to persuade this Court of the need for immediate appellate review. *Kuebler v Kuebler*, unpublished order of the Court of Appeals, entered June 9, 2021 (Docket No. 357019).

another temporary order further increasing plaintiff's parenting time. Judge Van den Bergh again did not hold an evidentiary hearing.

Third, in July 2021, after receiving updates from the GAL but without holding an evidentiary hearing, Judge Van den Bergh again increased plaintiff's parenting time, awarding her overnight visits with the children. Defendant appealed the July 2021 order to this Court. This Court vacated the trial court's July 2021 order and remanded the case with instruction to the trial court to comply with the Child Custody Act and, more specifically, to hold an evidentiary hearing before making any further changes to custody or parenting time.[4] However, before the trial court entered an order, the parties entered into a stipulated interim agreement regarding custody and parenting time, which the trial court approved. Under the agreement, defendant retained sole legal custody, while plaintiff received a gradual increase in parenting time, including more overnights. In light of this stipulation, defendant sought—and received—this Court's approval to delay the evidentiary hearing in order to allow the parties to proceed with further settlement negotiations and minimize litigation.[5]

An evidentiary hearing was eventually held over several days in August 2021, April 2022, and June 2022. Before turning to the evidentiary hearing and Judge Van den Bergh's July 2022 ruling in this case, a few additional points in the procedural history warrant mention. First, we note that, in November 2021, while the evidentiary hearing was ongoing, Judge Van den Bergh entered a second stipulated interim order regarding parenting time. Under this most recent interim order, plaintiff's parenting time again increased to a total of five overnights in a 14-day period; defendant retained sole legal custody. Second, in March 2022, defendant moved to show cause why plaintiff should not be held in contempt for violating a 2017 order of the trial court regarding the use of Our Family Wizard.[6] The trial court declined to hold plaintiff in contempt, but ordered her to comply going forward, and in April 2022, the trial court modified the 2017 Our Family Wizard order to address issues raised by the parties concerning their use of the application. Third, we note that, during the course of the lower court proceedings, defendant twice moved to disqualify Judge Van den Bergh for bias. Those motions were denied, and when defendant sought leave to appeal, this Court denied the applications for leave to appeal for lack of merit in the grounds presented.[7]

---

[4] This Court ordered that a hearing should be held within 21 days. *Kuebler v Kuebler*, unpublished order of the Court of Appeals, entered August 18, 2021 (Docket No. 357828).

[5] See *Kuebler v Kuebler*, unpublished order of the Court of Appeals, entered August 27, 2021 (Docket No. 357828).

[6] Our Family Wizard is an electronic messaging program that a trial court may order parties to use to communicate regarding custody and parenting time matters when other methods of communication have proved contentious or ineffective.

[7] *Kuebler v Kuebler*, unpublished order of the Court of Appeals, entered October 20, 2021 (Docket No. 358477); *Kuebler v Kuebler*, unpublished order of the Court of Appeals, entered October 20, 2021 (Docket No. 358533).

-5-

By the time the trial court held an evidentiary hearing in this case, plaintiff was requesting joint legal and physical custody with a 50/50 split of parenting time. At the hearing, the parties presented testimony from defendant, plaintiff, the GAL, and Dr. Vaitkus. Over defendant's objections, and despite his motion in limine to exclude them, the trial court also considered LARA documents indicating that the Disciplinary Subcommittee of the Board of Psychology had found that allegations against Dr. Ludolph—to the effect that she had failed to conduct her examinations in this case in an unbiased and impartial manner—were "true." The trial court reasoned that the LARA documents were admissible under the public records exception to the hearsay rule, MRE 803(8). Over defendant's hearsay objections, the trial court also admitted the GAL's reports into evidence at the hearing, relying on MRE 803(24), the catch-all exception to the hearsay rule. The trial court also met with BK to consider her preference; it concluded, however, that SK was too young to express a preference.

Ultimately, on July 28, 2022, the trial court issued an opinion and a separate order modifying custody and parenting time. Briefly summarized, the trial court found that plaintiff had established proper cause or a change in circumstance under *Vodvarka*[8] because (1) her mental health was currently stable and (2) for more than a year, in compliance with the parties' stipulations, plaintiff had exercised more expansive parenting time with the children, including overnight visits, without incident and without fabricating allegations against defendant. Emphasizing the length of time during which plaintiff had exercised more expansive parenting time and the relationship she had formed with the children during that time, the trial court also concluded that an established custodial environment existed with both parents. As noted, at the time of the evidentiary hearing, under the most recent interim order, defendant had sole legal custody and the parties shared joint physical custody, with plaintiff receiving five days out of each 14-day period. Plaintiff sought to substantially modify defendant's established custodial environment, asking for a 50/50 split of parenting time; she also sought joint legal custody. The trial court nevertheless applied the preponderance-of-the-evidence standard to plaintiff's request to change custody; the trial court reviewed the best-interest factors under this standard; and the trial court also addressed joint custody under MCL 722.26a(1)(b).

As stated, the trial court's opinion and order changed custody from sole legal custody to joint legal custody, and awarded the parties joint physical custody. The trial court denied plaintiff's request for 50/50 parenting time year round, awarding her five overnights in a 14-day period during the school year. However, the trial court increased plaintiff's parenting time to include a 50/50 split of parenting time during the summers. The trial court also ordered that the parties' communication would continue to be limited to the use of Our Family Wizard. Additionally, the trial court ordered that the GAL would continue in her appointment for another year to "facilitate communications between the parties." This appeal followed.

---

[8] *Vodvarka v Grasmeyer*, 259 Mich App 499; 675 NW2d 847 (2003).

## II. CUSTODY AND PARENTING-TIME DETERMINATIONS

Defendant raises a long list of arguments related to the trial court's custody and parenting-time determinations; these include evidentiary issues; arguments related to the trial court's findings and application of the Child Custody Act; and issues implicating res judicata, collateral estoppel, and law of the case.[9]

## A. STANDARD OF REVIEW

> In matters involving child custody, all orders and judgments of the circuit court shall be affirmed on appeal unless the trial judge made findings of fact against the great weight of evidence or committed a palpable abuse of discretion or a clear legal error on a major issue. This Court will not interfere with the trial court's factual findings unless the facts clearly preponderate in the opposite direction. Discretionary rulings, including a trial court's decision to change custody, are reviewed for an abuse of discretion. In child custody cases specifically, an abuse of discretion retains the historic standard under which the trial court's decision must be palpably and grossly violative of fact and logic. Clear legal error occurs when the trial court incorrectly chooses, interprets, or applies the law. This Court reviews the trial court's determination regarding a child's best interests for clear error. This Court gives deference to the trial court's factual judgments and special deference to the trial court's credibility assessments. [*Brown v Brown*, 332 Mich App 1, 8-9; 955 NW2d 515 (2020) (quotation marks and citations omitted).]

Regarding defendant's evidentiary issues, we review for an abuse of discretion a trial court's decision to admit or exclude evidence, but preliminary legal questions regarding the admissibility of evidence are reviewed de novo. See *Nahshal v Fremont Ins Co*, 324 Mich App 696, 709-710; 922 NW2d 662 (2018); *Reed v Reed*, 265 Mich App 131, 160; 693 NW2d 825 (2005). We review de novo the interpretation and application of statutes, court rules, and the rules of evidence. *Donkers v Kovach*, 277 Mich App 366, 369; 745 NW2d 154 (2007). We also review

---

[9] Defendant preserved his evidentiary claims with timely and specific objections on the same grounds that he presents on appeal. See *Nahshal v Fremont Ins Co*, 324 Mich App 696, 709-710; 922 NW2d 662 (2018). See also MRE 103(a)(1). The issues on appeal related to the trial court's findings and application of the Child Custody Act—i.e., proper cause and change of circumstances, the existence of an established custodial environment, the burden of proof, the trial court's assessment of the best-interest factors, etc.—were raised and decided below, meaning that these issues are preserved for this Court's review. See *Marik v Marik*, 325 Mich App 353, 358; 925 NW2d 885 (2018). Indeed, no specific objection is required to preserve a challenge to the trial court's finding or decision. See MCR 2.517(A)(7); *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). Lastly, defendant also preserved his arguments related to res judicata, collateral estoppel, and the law of the case by raising them in the trial court in his written response to plaintiff's motions to change custody and parenting time. See *Glasker-Davis*, 333 Mich App at 227.

de novo the application of legal and equitable doctrines, such as res judicata, collateral estoppel, and law of the case. See *Estes v Titus*, 481 Mich 573, 579; 751 NW2d 493 (2008); *Kasben v Hoffman*, 278 Mich App 466, 470; 751 NW2d 520 (2008).

## B. EVIDENTIARY ISSUES

Defendant raises three evidentiary issues, challenging (1) the admission of the GAL's reports, (2) the admission of the LARA documents, and (3) the admission of expert opinions about domestic violence, related to events before the entry of the 2017 consent judgment. We conclude that the trial court abused its discretion in each instance by admitting the evidence in question and that these evidentiary errors, individually or cumulatively, warrant relief.

## 1. THE GAL REPORTS

With certain exceptions not applicable in this case, the rules of evidence apply to "all actions and proceedings in the courts of this state," MRE 1101(a), including child-custody disputes.[10] See also *Watson v Watson*, 204 Mich App 318, 321; 514 NW2d 533 (1994) (recognizing a parent's right, in a custody dispute, "to have the court apply the rules of evidence and the principles that govern the means of obtaining proof"). Generally, all relevant evidence is admissible, unless excluded by "the Constitution of the United States, the Constitution of the State of Michigan, these rules, or other rules adopted by the Supreme Court." MRE 402. Under MRE 802, hearsay evidence is not admissible unless it falls within an exception provided in the court rules. "Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted." *Tobin v Providence Hosp*, 244 Mich App 626, 640; 624 NW2d 548 (2001). See also MRE 801(c).

In this case, it is undisputed that the GAL's reports constituted hearsay to the extent they included statements from the GAL's interviews and conversations with a variety of people, including the children, the children's paternal grandfather, plaintiff's therapist, the children's therapist, the parties, and the parties' lawyers. The trial court acknowledged that the reports were hearsay, but admitted the reports under the "catch-all exception" to the hearsay rule, MRE 803(24), which provides that the following statements are not excluded by the hearsay rule:

> A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact, (B) the statement is more probative on the point for which it is offered than any other evidence that the proponent can procure through reasonable efforts, and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. However, a statement may not be

---

[10] MRE 1101(b) carves out two exceptions potentially applicable to child-custody disputes: (1) *in camera* proceedings to determine a child's custodial preference, MRE 1101(b)(6); and (2) a court's "consideration of a report or recommendation submitted *by the friend of the court* pursuant to MCL 552.505(1)(g) or (h)." (Emphasis added.) Neither of these provisions in MRE 1101(b) exempt a GAL's report from consideration under the rules of evidence.

admitted under this exception unless the proponent of the statement makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The requirements of the catch-all exception "are stringent and will rarely be met," and this exception should not be applied in a manner that will "swallow" the hearsay rules through overuse. *People v Katt*, 468 Mich 272, 289; 662 NW2d 12 (2003). "To be admitted under MRE 803(24), a hearsay statement must: (1) demonstrate circumstantial guarantees of trustworthiness equivalent to the categorical exceptions, (2) be relevant to a material fact, (3) be the most probative evidence of that fact reasonably available, and (4) serve the interests of justice by its admission." *Id*. at 290.

The trial court's analysis under MRE 803(24) was perfunctory, and the trial court failed to consider each requirement of the rule. The trial court simply stated that MRE 803(24) applied because "the GAL is the eyes and ears of the Court, and under the hearsay objections the Court finds that this testimony – this report is otherwise reliable under the hearsay exception."[11] Contrary to the trial court's reasoning, investigative and evaluative reports are often found to be inadmissible hearsay. See *Bradbury v Ford Motor Co*, 419 Mich 550, 553; 358 NW2d 550 (1984). The GAL's reports are founded on hearsay interviews, and individuals speaking to a GAL preparing a report in anticipation of litigation would have any number of motivations to misrepresent facts to favor or disparage one parent, meaning that the report cannot simply be presumed trustworthy. See generally *Solomon v Shuell*, 435 Mich 104, 120; 457 NW2d 669 (1990) (recognizing, in the context of the records exception, that when "the source of information or the person preparing the report has a motivation to misrepresent, trustworthiness can no longer be presumed . . . ."). There is, in short, nothing particularly demonstrative of trustworthiness in a GAL's report or in the hearsay-within-hearsay that a GAL's report contains, merely because the report was prepared by a GAL at the trial court's direction. The trial court erred as a matter of law in its overly broad application of the catch-all exception under MRE 803(24). See *Katt*, 468 Mich at 289-290.

Plaintiff appears to recognize that the catch-all exception to the hearsay rule does not apply in this case. Rather than defend the trial court's rationale, plaintiff argues that the GAL reports are admissible without regard to the rules of evidence under a probate court rule, MCR 5.121(D)(1), which states:

> (D) Evidence.
>
> (1) Reports, Admission Into Evidence. Oral and written reports of a guardian ad litem or visitor may be received by the court and may be relied on to

---

[11] The Friend of the Court (FOC) also serves an investigatory function for courts in custody disputes, see MCL 552.505(1)(g), but while FOC reports may be considered under MRE 1101(b), they are not admissible into evidence over an objection from one of the parties. See *Bowler v Bowler*, 351 Mich 398, 404-405; 88 NW2d 505 (1958); *Duperon v Duperon*, 175 Mich App 77, 79; 437 NW2d 318 (1989).

the extent of their probative value, even though such evidence may not be admissible under the Michigan Rules of Evidence.

(2) Reports, Review and Cross-Examination.

(a) Any interested person shall be afforded an opportunity to examine and controvert reports received into evidence.

(b) The person who is the subject of a report received under subrule (D)(1) shall be permitted to cross-examine the individual making the report if the person requests such an opportunity.

(c) Other interested persons may cross-examine the individual making a report on the contents of the report, if the individual is reasonably available. The court may limit cross-examination for good cause.

MCR 5.121(D)(1) is found in Chapter 5 of the Michigan Court Rules, which govern probate court proceedings. In contrast, the court rules related to child custody are set forth in Subchapter 3.200 of the Michigan Court Rules. See MCR 3.201(A)(1). Under Subchapter 3.200, the trial court may appoint a GAL to represent the child. MCR 3.204(D). Subchapter 3.200 of the Michigan Court Rules says nothing to support that a GAL's report may be admitted into evidence without regard to the rules of evidence.

Plaintiff asserts, however, that MCR 5.121(D)(1) should also apply to child-custody disputes, to allow the admission of a GAL report without regard to the rules of evidence, in light of MCR 3.201(C), which states: "Except as otherwise provided in this subchapter, practice and procedure in domestic relations actions is governed by *other applicable provisions* of the Michigan Court Rules, except the number of interrogatories set forth in MCR 2.309(A)(2) shall be thirty-five." (Emphasis added.) According to plaintiff, MCR 5.121(D)(1) constitutes an "other applicable" provision that may apply to child-custody disputes. We disagree.

When examining the court rules, "[t]he intent of the rule must be determined from an examination of the court rule itself and its place within the structure of the Michigan Court Rules as a whole." *Haliw v Sterling Hts*, 471 Mich 700, 706; 691 NW2d 753 (2005). This Court must also be "mindful of the surrounding body of law into which the provision must be integrated . . . ." *Id*. (quotation marks and citation omitted).

In this case, as noted, MCR 5.121 appears in the probate court section of the court rules, which governs procedure in the probate court, MCR 5.001. The organizational placement in the structure of the court rules supports that this rule applies in probate court proceedings, not domestic relations actions. See *Haliw*, 471 Mich at 706. The specifics of MCR 5.121(D)—providing for

reports by a GAL or a "visitor,"[12] as well as cross-examination of a GAL or visitor by any "interested person"[13]—further supports that this is a probate court rule that has no application in domestic relations actions. That is, the rule, as written, clearly contemplates its application in probate court proceedings in which visitors and interested persons might also play a role. Simply stated, as written, MCR 5.121 governs the appointment of a GAL (or visitor), their duties, and the use of their reports *in probate court*.

In contrast, in domestic relations actions, the applicable rule governing the appointment of a GAL is, as noted, MCR 3.204(D), which states:

> In a case involving a dispute regarding the custody of a minor child, the court may, on motion of a party or on its own initiative, for good cause shown, appoint a guardian ad litem to represent the child and assess the costs and reasonable fees against the parties involved in full or in part.

This rule says nothing about a GAL preparing a report or admitting such a report into evidence without regard to the rules of evidence that otherwise apply in custody proceedings. See MRE 1101(a).

Further, automatic admission of the GAL's report without regard to the rules of evidence is not supported by the Child Custody Act. Under the Child Custody Act, the trial court may "[u]tilize a guardian ad litem or the community resources in behavioral sciences and other professions in the investigation and study of custody disputes and *consider* their recommendations for the resolution of the disputes." MCL 722.27(1)(d) (emphasis added). "Rules of practice set forth in any statute, if not in conflict with any of [the court rules], are effective until superseded by rules adopted by the Supreme Court." MCR 1.104. Absent a superseding court rule, MCL 722.27(1)(d) governs the practice regarding use of a GAL's recommendations in a custody dispute.

Under this statute, the trial court's review of a GAL's recommendation is limited to *considering* those recommendations; there is no provision for admitting a report without regard to the rules of evidence. The fact that a trial court is allowed to "consider its recommendations" is not the same as stating that a report is admissible as evidence. Indeed, as a comparison, the long-established rule with regard to reports prepared by the Friend of the Court (FOC) in custody disputes is that the trial court may "consider its recommendations," but the report is "not admissible as evidence over proper objection." *Bowler v Bowler*, 351 Mich 398, 404-405; 88 NW2d 505 (1958). See also *Duperon v Duperon*, 175 Mich App 77, 79; 437 NW2d 318 (1989) ("The FOC's

---

[12] As defined in the Estates and Protected Individuals Code, MCL 700.1101 *et seq*., the term "visitor" means "an individual appointed *in a guardianship or protective proceeding* who is trained in law, nursing, or social work, is an officer, employee, or special appointee of the court, and has no personal interest in the proceeding." MCL 700.5101(d) (emphasis added).

[13] See MCR 5.125 (providing a long list of potentially "interested persons" relative to probate court proceedings).

report and recommendation is not admissible as evidence unless both parties agree to admit it in evidence. However, the report may be considered by the trial court as an aid to understanding the issues to be resolved.").[14]  In sum, reading MCR 3.204(D) and MCL 722.27(1)(d) together, when a GAL is appointed, the GAL may offer recommendations to be *considered* by a trial court, but such recommendations remain subject to the rules of evidence, meaning that a GAL report containing hearsay may not be admitted into evidence over proper objection. The trial court committed clear legal error, and thereby abused its discretion, by admitting the GAL's reports into evidence over defendant's proper hearsay objections. *Nahshal*, 324 Mich App at 709-710; *Reed*, 265 Mich App at 160.

## 2.  THE LARA DOCUMENTS

The trial court also erred by concluding that the LARA documents were admissible under the public records exception, MRE 803(8). Under this provision, the following are not excluded by the hearsay rule:

> Public Records and Reports.  Records, reports, statements, or data compilations, in any form, of public offices or agencies, setting forth (A) the activities of the office or agency, or (B) matters observed pursuant to duty imposed by law as to which matters there was a duty to report, excluding, however, in criminal cases matters observed by police officers and other law enforcement personnel, and subject to the limitations of MCL 257.624.  [MRE 803(8).]

Notably, MRE 803(8) is narrow with respect to the kinds of public records and reports that may be admitted under this rule. See *Bradbury*, 419 Mich at 554. That is, unlike its federal counterpart, MRE 803(8) does *not* allow the admission of "evaluative and investigative reports," nor does it allow for the admission of "factual findings resulting from an investigation made in accordance with authority granted by law."[15]  *Id*. at 553-554.

In this case, the LARA documents admitted by the trial court contain a finding of facts by the disciplinary subcommittee that the allegations contained in a complaint against Dr. Ludolph—

---

[14] Similarly, in a custody dispute, the trial court may also appoint a lawyer-guardian ad litem (LGAL) for the child. MCL 722.24(2). The LGAL is expressly authorized by the Child Custody Act to "file a written report and recommendation." MCL 722.24(3). By statute, "[t]he court may read the [LGAL's] report and recommendation. The court shall not, however, admit the report and recommendation into evidence unless all parties stipulate the admission. The parties may make use of the report and recommendation for purposes of a settlement conference." MCL 722.24(3).

[15] In a civil case in federal court, in addition to the records admissible under Michigan's rule, FRE 803(8)(A)(*iii*) also allows for the introduction of a record of a public office of "factual findings from a legally authorized investigation." When the Michigan Supreme Court adopted MRE 803(8), it specifically rejected a version that would have included comparable language. See *Bradbury*, 419 Mich at 553-554.

-12-

alleging professional misconduct by her in relation to her evaluations in this case and others—
were true. Under MCL 333.16221, the provision cited in the LARA documents, LARA is
specifically charged with investigating allegations of disciplinary misconduct. Its factual findings
made during such an investigation, as set forth in the LARA judgment at issue in this case, are *not*
admissible under MRE 803(8). See *Bradbury*, 419 Mich at 553-554. The trial court committed
clear legal error, and thereby abused its discretion, by relying on the public records exception to
admit these documents over defendant's hearsay objections. See *id*; see also *Nahshal*, 324 Mich
App at 709-710; *Reed*, 265 Mich App at 160.

Briefly, we note that defendant also argues that the LARA documents contain inadmissible
hearsay-within-hearsay. We agree. Under MRE 805, "hearsay within hearsay is excluded where
no foundation has been established to bring each independent hearsay statement within a hearsay
exception." *Solomon*, 435 Mich at 129. The allegations in the complaint, which the disciplinary
subcommittee found to be true, consist of a long list of opinions by an unidentified expert to the
effect that Dr. Ludolph had made professional errors in her evaluations in this case. Opinions of
a nontestifying expert are unquestionably hearsay. See *People v Payne*, 285 Mich App 181, 196;
774 NW2d 714 (2009). This added level of hearsay further supports that the trial court erred by
admitting the LARA documents into evidence over defendant's hearsay objections.[16]

### 3. OPINIONS RELATED TO DOMESTIC VIOLENCE

We also conclude that the trial court erred as a matter of law, and thereby abused its
discretion, by admitting opinion testimony related to domestic violence that had allegedly occurred
before the parties' divorce.

"At least as between the parties to the decree, a divorce decree awarding the custody of a
child is final and conclusive as to all questions or circumstances affecting the matter and existing
at the time it was rendered." 27 CJS Divorce § 1097. In other words, "proceedings for the
modification of child custody provisions generally require new evidence that was not available in
the divorce action." 10 Michigan Pleading & Practice (2d ed), § 70:323. See also *Huger v Huger*,
313 Mich 158, 163; 20 NW2d 848 (1945). The proceedings in 2017 resulted in a divorce judgment
recognizing that defendant needed treatment for anger issues; notwithstanding allegations of
domestic violence, there was no finding of domestic violence, and absent new evidence, the

---

[16] The trial court also admitted a stipulation between Dr. Ludolph and the disciplinary
subcommittee. Under the stipulation, Dr. Ludolph pleaded no contest to violation of
MCL 333.16221(a). In pleading no contest, Dr. Ludolph did not admit the truth of the allegations.
Instead, she agreed to the stipulation because she wished to "resolve this matter without incurring
the additional stress, time, energy, resources, or expense of litigating the issues." She also stated
that, when performing evaluations in child-custody and parenting disputes, she "always
endeavored to be fair and impartial," she believed that she considered the "statements of collateral
witnesses and the opinions of other mental health professionals," and she made "every effort" to
keep the children's best interests "as her paramount objective." Although not a finding by LARA,
the stipulation also evinces no wrongdoing by Dr. Ludolph, and it is frankly irrelevant.

-13-

divorce judgment is final and conclusive as to this question. Plaintiff's allegations of domestic violence against defendant relate to events that occurred long before the divorce judgment. The trial court erred by reopening this issue to rehash long-settled disputes.[17]

Relatedly, given the age of plaintiff's allegations, we fail to see how her allegations can be considered relevant to the question whether there were grounds to modify custody under the Child Custody Act. The purpose of a child-custody proceedings to modify an existing custody order is to determine the best interests of the children on the basis of "up-to-date information" and "any other changes in circumstances arising since the trial court's original custody order." *Fletcher v Fletcher*, 447 Mich 871, 889; 526 NW2d 889 (1994). See also *Vodvarka v Grasmeyer*, 259 Mich App 499, 515; 675 NW2d 847 (2003) ("[A] party would be hard-pressed to come to court after a custody order was entered and argue that an event of which they were (or could have been ) aware before the entry of the order is thereafter significant enough to constitute proper cause to revisit the order.").[18] There was absolutely no evidence of recent domestic violence in defendant's home, or even of any *allegations* of recent domestic violence. To the contrary, even plaintiff conceded that defendant has done a "great job" with the children for the more than five years that they were in his sole custody. In this context, rehashing plaintiff's old allegations from before 2017, which, frankly, were not even meaningfully developed at the evidentiary hearing, added nothing to the determination of the children's best interests or the other required findings under the Child Custody Act.

Moreover, plaintiff's primary evidence that she was a victim of domestic violence came from her therapist, Dr. Vaitkus, who testified that plaintiff believed that she was a victim of

---

[17] Indeed, while allowing plaintiff to reopen the domestic-violence question, the trial court actually prevented defendant from asking plaintiff about her behavior before entry of the divorce judgment, stating that it was irrelevant, a waste of time, and should not be considered. The trial court similarly curbed defendant's efforts to ask about plaintiff's violation of past orders, stating: "I'm trying to get with what is in the best interests of the children now *since entry of the last order*. *That's the relevant evidence in this case*. And that is what the case law says. So I would like you to stay within those parameters, please." (Emphasis added.) The trial court should have applied the same reasoning to preclude plaintiff's efforts to relitigate matters from before the divorce.

[18] As noted, there was nothing that prevented plaintiff from presenting her allegations of domestic violence to the trial court for decision before entry of the divorce judgment; instead, plaintiff opted to sign a consent judgment, and with her consent, the bench trial that was scheduled in 2017 was canceled. Cf. *Vodvarka*, 259 Mich App at 515 (allowing consideration of predivorce evidence in an unusual case in which the custody order was entered without the defendant's signature or a hearing). As this Court recognized in plaintiff's previous appeal, the consent judgment in this case represented an agreement by the parties as to the facts existing at the time of the divorce judgment. *Kuebler*, unpub op at 12 n 11. "It goes without saying that if the parties intend that the settlement is to bind them on certain issues of fact," those intentions as to the facts, as reflected in the consent judgment, will be binding. See *American Mut Liability Ins Co*, 64 Mich App at 327.

domestic violence and that plaintiff was not lying.[19]  It is, however, blackletter law that an "expert cannot opine that complainant was a battered woman, may not testify that defendant was a batterer or that he is guilty of the crime, and cannot comment on whether [a] complainant was being truthful." *People v Christel*, 449 Mich 578, 591; 537 NW2d 194 (1995).  The trial court erred by allowing Dr. Vaitkus to offer opinions on these subjects over defendant's express and timely objections.  See *id*.  For these reasons, we conclude that the trial court committed clear legal error, and thereby abused its discretion, by reopening the domestic-violence question and allowing plaintiff to present inadmissible evidence on this topic.  See *Nahshal*, 324 Mich App at 709-710; *Reed*, 265 Mich App at 160.

## 4.  EFFECT OF THE EVIDENTIARY ERRORS

Whether considered individually or cumulatively, the erroneous admission of evidence in this case warrants relief on appeal.  See *Reed*, 265 Mich App at 160.  Defendant had the right to have the trial court decide this custody dispute in accordance with "the rules of evidence and the principles that govern the means of obtaining proof." *Watson*, 204 Mich App at 321.  Instead, relying on hearsay, old allegations, and improperly-admitted expert opinions, the trial court reached unfavorable opinions of defendant, viewing him as someone trying to exercise "control" over plaintiff, while, in comparison, perceiving plaintiff sympathetically as someone "fight[ing]" for parenting time and showing stability in "trying circumstances."  These conclusions permeated the trial court's findings under the Child Custody Act, including the best-interest factors.  These evidentiary errors were not harmless, and it would be inconsistent with substantial justice to allow the trial court's ruling premised on these components to stand.  See *Reed*, 265 Mich App at 160.  Consequently, on the basis of the evidentiary errors alone, we find it necessary to vacate the trial court's order and remand for further proceedings.

## C.  TRIAL COURT'S FINDINGS AND APPLICATION OF THE CHILD CUSTODY ACT

Defendant also raises numerous challenges to the trial court's findings and application of the Child Custody Act, including issues related to the interim orders, proper cause or change in circumstances, the existence of an established custodial environment, the applicable burden of proof, the best-interest factors, and joint custody.  Although not all of defendant's arguments have merit, we conclude that the trial court erred by applying a preponderance-of-the-evidence standard; that the trial court's finding that factor (j) favored plaintiff, even slightly, was against the great weight of the evidence; and that, relevant to joint legal custody, the evidence clearly preponderates against the trial court's conclusion that the parties in this case are able to communicate and make joint decisions regarding the children.  For these reasons, in addition to the evidentiary errors already discussed, we vacate the trial court's order and remand for further proceedings.

## 1.  OVERVIEW OF THE CHILD CUSTODY ACT

The Child Custody Act provides a comprehensive scheme for resolving child-custody disputes, *Yachcik v Yachcik*, 319 Mich App 24, 51; 900 NW2d 113 (2017), including specific

---

[19] Dr. Vaitkus was also plaintiff's therapist beginning in 2015 or 2016, before the divorce judgment, meaning that this inadmissible evidence was also not new evidence.

procedural requirements and factual findings under MCL 722.27(1)(c) that must be made before a trial court may modify a child's established custodial environment, *Daly v Ward*, 501 Mich 897 (2017). Under the Child Custody Act, the overriding concern is the children's best interests. *McIntosh v McIntosh*, 282 Mich App 471, 475; 768 NW2d 325 (2009). Among the purposes of the Child Custody Act "are to promote the best interests of the child and to provide a stable environment for children that is free of unwarranted custody changes." *Lieberman v Orr*, 319 Mich App 68, 78; 900 NW2d 130 (2017) (quotation marks and citation omitted). The standards for changing custody apply equally to physical and legal custody of the children. See *Merecki v Merecki*, 336 Mich App 639, 647; 971 NW2d 659 (2021).

To protect children's stability, MCL 722.27 imposes a gatekeeping function on the trial court and provides standards that a moving parent must satisfy to change custody or parenting time. *Lieberman*, 319 Mich App at 78. "As set forth in MCL 722.27(1)(c), when seeking to modify a custody or a parenting-time order, the moving party must first establish proper cause or a change of circumstances before the court may proceed to an analysis of whether the requested modification is in the child's best interests." *Id*. at 81. The standard applicable to this threshold inquiry depends on whether the moving party seeks to (1) modify custody; (2) modify parenting time; or (3) impose, revoke, or modify a condition of parenting time. See *Kaeb v Kaeb*, 309 Mich App 556, 569; 873 NW2d 319 (2015). In this case, the trial court applied the standard applicable to a change of custody under *Vodvarka*, 259 Mich App at 509-514. Under this standard:

> To establish a change of circumstances sufficient for a court to consider modifying a custody order, the movant must prove by a preponderance of the evidence that since the entry of the last custody order, the conditions surrounding custody of the child, which have or could have a significant effect on the child's well-being, have materially changed. [T]he evidence must demonstrate something more than the normal life changes (both good and bad) that occur during the life of a child, and there must be at least some evidence that the material changes have had or will almost certainly have an effect on the child. [T]o establish proper cause necessary to revisit a custody order, a movant must prove by a preponderance of the evidence the existence of an appropriate ground for legal action to be taken by the trial court. As is the case with a change of circumstances, [t]he appropriate ground(s) should be relevant to at least one of the twelve statutory best interest factors, and must be of such magnitude to have a significant effect on the child's well-being. [*Lieberman*, 319 Mich App at 81-82 (quotation marks and citations omitted; alterations in original).]

If proper cause or a change in circumstances is shown, the trial court nevertheless "shall not modify or amend its previous judgments or orders or issue a new order so as to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." MCL 722.27(1)(c).

> The custodial environment of a child is established if over an appreciable time the child naturally looks to the custodian in that environment for guidance, discipline, the necessities of life, and parental comfort. The age of the child, the physical

environment, and the inclination of the custodian and the child as to permanency of the relationship shall also be considered. [MCL 722.27(1)(c).]

An established custodial environment is "both a physical and a psychological environment that fosters a relationship between custodian and child and is marked by security, stability, and permanence." *Berger v Berger*, 277 Mich App 700, 706; 747 NW2d 336 (2008). It may be "established as a result of a temporary custody order, in violation of a custody order, or in the absence of a custody order." *Id*. at 707.

Whether an established custodial environment exists dictates the evidentiary burden applicable to the parent seeking to alter a child's environment. If no established custodial environment exists, "the trial court may change custody if it finds, by a preponderance of the evidence, that the change would be in the child's best interests." *LaFleche v Ybarra*, 242 Mich App 692, 696; 619 NW2d 738 (2000). However, when "an established custodial environment does exist, a court is not to change the established custodial environment of a child unless there is presented clear and convincing evidence that it is in the best interest of the child." *Id*. This clear-and-convincing-evidence standard also applies when there is an established custodial environment with *both parents*. *Foskett v Foskett*, 247 Mich App 1, 8; 634 NW2d 363 (2001). That is, when there is an established custodial environment with both parents, neither parent's established custodial environment "may be disrupted except on a showing, by clear and convincing evidence, that such a disruption is in the children's best interests." *Id*.

The evidentiary burden is also affected by the proposed change. A mere adjustment in parenting time that will not alter the children's custodial environment requires the movant to prove by a preponderance of the evidence that the change is in the child's best interests. *Lieberman*, 319 Mich App at 84. However, in "matters affecting custody," the movant must prove by clear and convincing evidence that the proposed change is in the child's best interests. *Id*. at 83-84. Further, a proposed change to parenting time that has the effect of altering the established custodial environment is also subject to the clear-and-convincing-evidence standard. *Id*. at 84.

To determine a child's best interests, the trial court is required to consider the 12 best-interest factors found in MCL 722.23, applying the appropriate standard of proof. *Foskett*, 247 Mich App at 9. "The trial court must consider and explicitly state its findings and conclusions with respect to each of these factors." *Id*. In cases involving a request for joint custody, "the trial court must also consider '[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child.' " *McIntosh*, 282 Mich App at 475 (alteration in original), quoting MCL 722.26a(1)(b).

On appeal, defendant raises numerous challenges related to the application of these principles in this case.

## 2. ARGUMENTS RELATED TO THE INTERIM ORDERS

At the outset, we note that portions of defendant's arguments appear to implicate the trial court's interim orders, specifically including the April 2021 order providing plaintiff with unsupervised parenting time and the July 2021 order allowing plaintiff overnight visits with the children. Defendant contends that the orders did not comply with the Child Custody Act; that

-17-

doctrines such as res judicata, collateral estoppel, and the law of the case, precluded these interim orders; and that, in entering these orders, the trial court effectively prejudged the case such that the proceedings that followed were merely an exercise in confirming that prejudgment. These complaints do not warrant relief on appeal at this time.

To a certain extent, we agree with some of defendant's concerns regarding the trial court's decisions to order unsupervised parenting time and overnight visits, at least insofar as he challenges the trial court's compliance with the Child Custody Act during these early proceedings. The Child Custody Act provides detailed requirements and procedures that must be followed before modifying custody or parenting time, and the reassignment of the case to a new trial judge is not a basis for simply reviewing the case "anew" as Judge Van den Bergh stated that she planned to do in April 2021. Instead, it was plaintiff's burden to show proper cause or a change of circumstances, and even if she met this burden, she also bore the burden of showing that the proposed change was in the children's best interests. See MCL 722.27(1)(c); *Lieberman*, 319 Mich App at 81; *Shade v Wright*, 291 Mich App 17, 23; 805 NW2d 1 (2010). Moreover, the factual issues underlying these questions were not uncontested. See MCR 3.210(C)(8). Yet, in April 2021, without even reviewing all the materials in this case and without holding an evidentiary hearing, the trial court overturned a parenting-time arrangement that had been in place for years. And two months later, again without an evidentiary hearing or following the procedures of the Child Custody Act, plaintiff was awarded overnight parenting visits with the children. The trial court erred by failing to follow the procedures of the Child Custody Act before modifying parenting time or custody. See MCL 722.27(1)(c); *Lieberman*, 319 Mich App at 81; *Shade*, 291 Mich App at 23.

With that said, it is also clear that any potential errors related to these interim orders do not warrant relief for defendant at this time. This Court provided defendant with a remedy for these errors in August 2021 when he appealed to this Court. At that time, this Court vacated the July 2021 order awarding plaintiff overnight visits and ordered the trial court to comply with the Child Custody Act, and in particular, to hold an evidentiary hearing before making any additional changes. Rather than move forward with the proceedings as ordered by this Court, the parties entered into a stipulation regarding plaintiff's parenting time, and they agreed to postpone the evidentiary hearing. Defendant then sought, and received, this Court's approval to proceed in accordance with the parties' stipulation rather than this Court's order. Later, in November 2021, defendant agreed to a second stipulated order, which again increased plaintiff's parenting time, and with defendant's agreement, the evidentiary hearing was again delayed.

A party cannot show error requiring reversal when, as in this case, the aggrieved party contributed to that error by plan or neglect. See *Genna v Jackson*, 286 Mich App 413, 422; 781 NW2d 124 (2009). Having stipulated to plaintiff's increase in parenting time, and having stipulated to the delay in the evidentiary hearing, defendant cannot now complain on appeal that the trial court erred by entering interim orders without following the procedures in the Child Custody Act. See *id*. Defendant is not entitled to relief on the basis of the interim orders. Instead, at this time, the pertinent questions on appeal relate to the trial court's final July 2022 order.

### 3. PROPER CAUSE OR CHANGE OF CIRCUMSTANCES

Defendant argues that the trial court's finding of proper cause or a change of circumstances was against the great weight of the evidence. See *Corporan v Henton*, 282 Mich App 599, 605; 766 NW2d 903 (2009). We disagree.

As this Court explained in its previous opinion, in 2017, the trial court entered a consent judgment that provided plaintiff with restricted, supervised parenting time because of her manipulative and alienating behavior, including fabricated allegations against defendant, which posed a danger to the children and which can provide sound reason for limiting a parent to supervised parenting time. See *Kuebler*, unpub op at 9, 13, citing *Martin v Martin*, 331 Mich App 224, 238; 952 NW2d 530 (2020). In November 2020, the trial court denied plaintiff's request to modify parenting time on the basis that her mental health had improved (or that she had originally been misdiagnosed), concluding that plaintiff's behavior had actually worsened over time as shown by a fabricated PPO request against defendant; false allegations that defendant broke into her house to steal her passport (which she found in her house); a "campaign to vilify" defendant by writing to his employer, posting on Facebook, and writing to the State Bar Commissioner; efforts to photograph SK's genitalia to support another false complaint to Children's Protective Services (CPS) against defendant (when in actuality SK had a common childhood rash); sharing information about the divorce with the children; and threatening to have the children removed from Catholic Services by police "kicking and screaming" and to put on the children on the front page of a newspaper to show that her parenting time was unfair.[20] *Kuebler*, unpub op at 9-11. This Court affirmed the trial court's denial of plaintiff's motion to modify parenting time, concluding that his findings were not against the great weight of the evidence. See *id*. at 9-13.

By the time of the trial court's decision in July 2022, plaintiff had, however, made changes for the better. As detailed in the trial court's July 2022 opinion, plaintiff has enjoyed unsupervised parenting time with the children since April 2021, including overnight visits since July 2021. Indeed, under the parties' most recent stipulation in November 2021, plaintiff had five overnights with the children out of each 14-day period. Notably, during this same period, plaintiff did not make any allegations against defendant to CPS, the police, or anyone else, and there was no evidence offered that she continued her campaign to vilify or malign defendant. Instead, from her testimony at the evidentiary hearing, it appears that plaintiff had finally come to recognize that the children were safe with defendant, that he worked "very hard" to care for them, and that he had done a "great job" with them; she voiced no complaints about his parenting. In other words, as a result of the interim parenting-time orders to which defendant stipulated, plaintiff was able to demonstrate over a prolonged period that she was capable of spending time with the children

---

[20] To the extent that plaintiff argued that her campaign to vilify defendant did not affect the children, this Court rejected that argument, noting that plaintiff's argument ignored "the significance of the pattern of [plaintiff's] behavior, which, much like her behavior at the time of the divorce, shows an ongoing effort to publicly malign [defendant]." *Kuebler*, unpub op at 10. "To suggest that such attacks on [defendant] will not impact the children or their relationship with [defendant], particularly as they continue to age, is simply disingenuous." *Id*.

without attempting to alienate them from defendant by accusing him of abuse or endeavoring to vilify and malign defendant as she has in the past. Moreover, with regard to proper cause, relevant to plaintiff's mental health under factor (g), plaintiff has been receiving mental-health treatment for almost five years, and her current provider, Dr. Vaitkus, opined that, regardless of past problems, plaintiff was currently functioning at a "high level." Overall, given evidence that plaintiff had not made any allegations against defendant since before November 2020, and given evidence that she had sought mental-health treatment and that she was currently stable, the trial court's conclusion that plaintiff had shown proper cause or a change of circumstances was not against the great weight of the evidence.[21]

Defendant, argues that doctrines such as res judicata, collateral estoppel, or the law of the case should preclude the trial court from reevaluating plaintiff's mental health or concluding that plaintiff showed proper cause or a change in circumstances.[22] Defendant is, however, mistaken in

---

[21] With regard to proper cause and change in circumstances, the parties again debate on appeal whether plaintiff has borderline personality disorder or whether another diagnosis is more appropriate for her. In focusing on a particular diagnosis, both parties are missing the big picture. As this Court previously stated: "A particular [mental-health] diagnosis, or lack thereof, does not necessarily make a parent inherently fit or unfit to see his or her children." *Kuebler*, unpub op at 13. Instead, it was plaintiff's propensity to fabricate allegations against defendant and to vilify him that has been at the heart of this case since the divorce judgment. See *id*. ("In this case it was—and remains—plaintiff's manipulative and alienating behavior, including her fabricated allegations of child abuse against defendant, that warranted the supervised parenting-time arrangement provided in the judgment of divorce."). Judge Van den Bergh appeared to recognize this fact in her July 2022 opinion, stating, "The Court is not, however, compelled by a specific diagnosis; it is the fact that [plaintiff] has consistently presented as stable, engages in treatment that is working, appropriately interacts with her children, and has not engaged in alleged problematic behavior for years." Judge Brown similarly focused on plaintiff's behavior and "actual observed conduct." See *id*. at 9. In short, it is plaintiff's behavior, not her diagnosis, that is important in this case.

[22] To a certain extent, we agree with defendant that a trial court cannot simply rewrite the history of a case. As discussed with regard to the question of domestic violence in particular, and the falsity of plaintiff's allegations of child abuse, the divorce judgment—which was a consent judgment—determining the custody of the children was "final and conclusive as to all questions or circumstances affecting the matter and existing at the time it was rendered," 27 CJS Divorce § 1097, and cannot be modified absent "new evidence that was not available in the divorce action." 10 Michigan Pleading & Practice (2d ed), § 70:323. See also *Huger*, 313 Mich at 163; *American Mut Liability Ins Co*, 64 Mich App at 327. Further, this Court's 2021 opinion, *Kuebler*, unpub op at 9-13, 15, represents the law of the case on the issues decided through Judge Brown's November 2020 order being appealed, which included determinations that this is not a domestic-violence case and that plaintiff fabricated allegations against defendant. See *Ashker v Ford Motor Co*, 245 Mich App 9, 13; 627 NW2d 1 (2001). Judge Van den Bergh should not have attempted to reopen settled questions from before the divorce judgment for relitigation, nor could she disregard this Court's opinion, in order conclude that plaintiff was not fabricating allegations

-20-

suggesting that res judicata, collateral estoppel, or the law of the case forever foreclose the possibility of modifying custody or parenting time in this case. The Child Custody Act expressly recognizes that circumstances relevant to a child's best interests can change, and it specifically allows for modification of custody and parenting time upon a showing of proper cause or change in circumstances. See MCL 722.27(1)(c). To apply res judicata or collateral estoppel to preclude consideration of changes in circumstances or new evidence relevant to a child's best interests in the child-custody context would subvert the intent of the Legislature as expressed in MCL 722.27(1)(c), and this Court will not apply preclusive doctrines to subvert the intent of the Legislature. See *Glaubius v Glaubius*, 306 Mich App 157, 174; 855 NW2d 221 (2014). Likewise, although this Court previously affirmed the trial court's denial of plaintiff's motion to change custody, the law-of-the-case doctrine does not apply to a subsequent motion making the same request when, as in this case, the facts have materially changed. See *Grace v Grace*, 253 Mich App 357, 363; 655 NW2d 595 (2002).

In sum, the record supports that plaintiff has not fabricated any allegations against defendant since before November 2020, and for more than a year, plaintiff has been able to demonstrate that she is capable of seeing the children unsupervised without fabricating allegations against defendant and without continuing her campaign to vilify him and alienate him from the children. Given these changes, the trial court's findings of proper cause or a change of circumstances were not against the great weight of the evidence. See *Corporan*, 282 Mich App at 605.

## 4. ESTABLISHED CUSTODIAL ENVIRONMENT AND BURDEN OF PROOF

Defendant also argues that the trial court's conclusion that the children have an established custodial environment with both parents was against the great weight of the evidence. See *Berger*, 277 Mich App at 706. We disagree. However, given that the children have an established custodial environment with both parties, the trial court committed a clear legal error on a major issue by applying the lower, preponderance-of-the-evidence standard to plaintiff's motion to modify defendant's established custodial environment. See *Jack v Jack*, 239 Mich App 668, 671; 610 NW2d 231 (2000).

There is no dispute that the trial court correctly concluded that the children have an established custodial environment with defendant; plaintiff concedes this point, and it is abundantly supported by the evidence at the evidentiary hearing, which demonstrated that the children had, for the entirety of their lives, looked to defendant for guidance, discipline, the necessities of life, and parental comfort. See MCL 722.27(1)(c). The only issue was whether the children also had an established custodial environment with plaintiff. Although the children's established custodial environment with plaintiff is certainly more recent, the record supports the trial court's conclusion that, over the previous year, as plaintiff had exercised additional parenting

---

against defendant such that the divorce judgment was wrongly entered or that Judge Brown erred by denying plaintiff's motion to modify parenting time in November 2020. With that said, as discussed, there were changed facts and circumstances, since November 2020, supporting Judge Van den Bergh's conclusions regarding proper cause or change in circumstances.

time including overnight visits, the children began to look to plaintiff for guidance, discipline, the necessities of life, and parental comfort. Plaintiff offered testimony to this effect and provided testimony about her parenting-time visits to support that she provides for their necessities while they are with her, that she disciplines them, and that she provides guidance and comfort. That defendant may have been the children's primary caregiver for the majority of their lives or that his established custodial environment is of longer duration does not preclude a finding that there was an established custodial environment in both households. See generally *Berger*, 277 Mich App at 706-707. Deferring to the trial court's credibility assessment, as we must, see *Brown*, 332 Mich App at 9, the trial court's conclusion that the children had an established custodial environment with both parents is not against the great weight of the evidence.

However, having concluded that the children have an established custodial environment with both parents, the trial court committed clear legal error by failing to apply a clear-and-convincing-evidence standard to plaintiff's motion to modify defendant's sole legal custody. See *Foskett*, 247 Mich App at 8; *Jack*, 239 Mich App at 671. At the time of the evidentiary hearing, defendant had sole legal custody and the parties shared joint physical custody, with plaintiff receiving five days out of each 14-day period. Plaintiff sought to substantially modify the children's established custodial environment with defendant; she asked for a 50/50 split of parenting time, and she also sought joint legal custody. These proposed changes were not merely a request to change parenting time; they had the effect of altering custody, and as a result, the clear-and-convincing-evidence standard of proof applied. See *Lieberman*, 319 Mich App at 84, 86-87 n 9. On remand, before making any further changes, the trial court shall apply the correct standard.

## 5. BEST-INTEREST FACTORS

Turning to the best-interest factors, defendant challenges the trial court's findings regarding factors (a) through (k). Deferring to the trial court's credibility assessments, as we must, we conclude that the majority of defendant's arguments lack merit. However, whether considered under a clear-and-convincing-evidence or the lower preponderance-of-the-evidence standard, the trial court's finding that factor (j) favored plaintiff, even slightly, was clearly against the great weight of the evidence. See *Brown*, 332 Mich App at 8.

Factor (a) involves consideration of the "love, affection, and other emotional ties existing between the parties involved and the child." MCL 722.23(a). In this case, the trial court concluded the parties were equal under factor (a) because they both loved their children and the children appeared attached to both parents. Deferring to the trial court's credibility assessments, this conclusion was not against the great weight of the evidence given testimony that the parties both loved their children and shared an emotional bond with them. See *Brown*, 332 Mich App at 8-9.

Factor (b) relates to the "capacity and disposition of the parties involved to give the child love, affection, and guidance and to continue the education and raising of the child in his or her religion or creed, if any." MCL 722.23(b). Under factor (b), the trial court concluded that the parties were equal because they were both committed to raising the children in their religious faith and both supportive of their school and other activities. The trial court recognized defendant's concerns about plaintiff's failure to return school uniforms, but this did not alter the trial court's conclusions when both children appeared to be thriving in school. Again, deferring to the trial court's credibility determinations, this conclusion was not against the great weight of the evidence

given testimony that both parties took the children to church and supported their education by, for example, helping with homework. See *Brown*, 332 Mich App at 8-9.

Factor (c) concerns the "capacity and disposition of the parties involved to provide the child with food, clothing, medical care or other remedial care recognized and permitted under the laws of this state in place of medical care, and other material needs." MCL 722.23(c). The trial court found the parties equal under factor (c) because both parties worked and had the capacity to provide for the children's needs. Although there were a few issues with the children's lunches and uniforms while in plaintiff's care, the trial court concluded that these issues were negligible and that the children's needs were being met. Deferring to the trial court's credibility determinations, its conclusion was not against the great weight of the evidence given testimony that both parties provided support and basic care for the children. See *Brown*, 332 Mich App at 8-9.

With regard to factor (c), relying on this Court's 2021 opinion, defendant specifically argues that this factor should not be scored equally because, in the past, plaintiff paid minimal child support and endeavored to conceal her change in employment from defendant, as a result of which plaintiff paid $109 per month for two years, between January 2018 and January 2020, when her contribution under the child support guidelines should have been closer to $1,000 per month.[23] It does not appear, however, that defendant raised this specific argument in the trial court. Moreover, the trial court's analysis of the best-interest factors should be based on up-to-date information. See *Fletcher*, 447 Mich at 889. Since January 2020, plaintiff has been paying the required amount of child support, and more recently, while having the children in her care, she has provided for their basic needs. The trial court's findings were not against the great weight of the evidence. See *Brown*, 332 Mich App at 8-9.

Factor (d) involves the "length of time the child has lived in a stable, satisfactory environment, and the desirability of maintaining continuity." MCL 722.23(d). The trial court found that factor (d) "slightly" favored defendant because the children had lived with him and his parents in a stable environment for a more prolonged period, indeed for almost their entire lives. The trial court weighed this factor in defendant's favor, and the decision to do so was not against the great weight of the evidence. See *Brown*, 332 Mich App at 8-9.

Factor (e) considers the "permanence, as a family unit, of the existing or proposed custodial home or homes." MCL 722.23(e). The trial court found the parties equal regarding factor (e) with regard to the permanency of their respective family units. More fully, the trial court reasoned: "Plaintiff-Father resides with his parents in Northville, Michigan who have helped care for the

---

[23] See *Kuebler*, unpub op at 15 ("[P]laintiff's attempt to prevent defendant and his attorney from learning of her employment is certainly troubling as it would hinder defendant's ability to petition the court to modify child support or to seek the FOC's review of child support as he was entitled to do . . . ."); *id*. at 19 ("Plaintiff has historically paid defendant only $109 a month in child support, and between January 2018 and January 2020 . . . she continued to make this low contribution, even after she obtained full-time employment that should have increased her monthly obligation to closer to $1,000 a month.").

children. Defendant-Mother resides in her own home in Ann Arbor, Michigan. There are pets, toys, and appropriate bedrooms for the children in each home and there are no changes expected to either family unit." To a certain extent, the trial court may have erred by considering the acceptability of the parties' respective homes in terms of "appropriate bedrooms" and available toys under factor (e), which concerns the *permanence* of the household, not its acceptability. See *Brown*, 332 Mich App at 21. But in any event, the record shows that plaintiff has lived by herself for several years, defendant also has a long-established family unit with his parents, and there is no indication that either household is expected to change.[24] In these circumstances, notwithstanding the any error in considering the acceptability of the homes, the trial court's conclusion that factor (e) weighed equally was not against the great weight of the evidence. See *id*. at 8-9.

Factor (f) relates to the "moral fitness of the parties involved." MCL 722.23(f). In analyzing this factor, the trial court considered the current moral fitness of the parties, noting that neither party had a criminal history and that, over the past year, the parties had "stabilized and established separate homes for the children" and "refocused their energy on the children's best interests." Deferring to the trial court's credibility determinations, the conclusion that neither party was favored was not against the great weight of the evidence given testimony that there have been no major issues, including no false allegations by plaintiff, for more than a year. See *Brown*, 332 Mich App at 8-9.

Factor (g) concerns the "mental and physical health of the parties involved." MCL 722.23(g). The trial court concluded that this factor favored neither party given that both parties had mental-health diagnoses and that both parties were receiving mental-health treatment to address their issues. Specifically, with regard to plaintiff, the trial court relied on Dr. Vaitkus's opinions to conclude that plaintiff was currently "stable" enough to parent her children regardless of any specific diagnosis. In concluding that plaintiff was stable, the trial court also again noted that plaintiff had not recently fabricated any allegations against defendant. Deferring to the trial court's credibility determinations, the conclusion that neither party was favored under factor (g) was not against the great weight of the evidence given testimony that plaintiff was stable, she had not recently made any allegations against defendant, and both parties were receiving mental-health treatment. See *Brown*, 332 Mich App at 8-9.

Factor (h) involves the "home, school, and community record of the child." MCL 722.23(h). The trial court concluded that factor (h) weighed equally because the children were doing well academically. The trial court concluded that both parents assisted the children with homework and were supportive of the existing school environment. Defendant challenges plaintiff's efforts to help the children with homework, but the trial court credited testimony from plaintiff that she does help the children with homework. Again, deferring to the trial court's

---

[24] On appeal, there is some discussion by the parties related to whether plaintiff has a boyfriend. At trial, plaintiff testified that the individual in question was just a friend, and even if he is a romantic partner, there was no evidence offered that plaintiff plans to alter her family unit by moving in with him.

credibility determinations, the conclusion that the parties were equal under this factor was not against the great weight of the evidence. See *Brown*, 332 Mich App at 8-9.

Factor (*i*) relates to the "reasonable preference of the child, if the court considers the child to be of sufficient age to express preference." MCL 722.23(*i*). To the extent that BK expressed a preference in this case, the trial court took that preference into account. The parties raise no arguments related to BK under factor (*i*). However, defendant argues that the trial court erred by also meeting with SK (during the same *in camera* interview) because the trial court had already concluded that SK was not old enough to express a preference. We agree that SK should not have been included in the interview. "[T]he subject of the *in camera* interview is *strictly* limited to determining the child's preference." *Surman v Surman*, 277 Mich App 287, 297-298; 745 NW2d 802 (2007). Before meeting with the children, the trial court had ruled that SK was too young to express a preference, and if it had already been determined that she was too young to express a preference, there was no conceivable reason for her to attend a meeting that was strictly limited to determining BK's preference. See *id*. With that said, defendant did not object in the trial court to SK also attending the meeting, and defendant does not explain how he was harmed by SK attending BK's *in camera* meeting with the trial court. Defendant has not established that the trial court's conclusions under this factor were against the great weight of the evidence.

Factor (j) relates to the "willingness and ability of each of the parties to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent or the child and the parents." MCL 722.23(j). "A court may not consider negatively for the purposes of this factor any reasonable action taken by a parent to protect a child or that parent from sexual assault or domestic violence by the child's other parent." MCL 722.23(j). In effect, factor (j) "favors parents who facilitate the relationship of their children with the other parent" because it is presumed to be in the children's best interests to have a strong relationship with both parents. *Martin*, 331 Mich App at 238-239. However, this presumption can be overcome with evidence that interference with the other parent's parental relationship is reasonably necessary for the child's safety, in which case, those reasonable acts cannot be counted against a parent under factor (j). *Id*. A parent's fabrications of abuse, or other conduct designed to obstruct or sabotage the opposing parent's relationship with the child, may be considered under factor (j). See *id*. at 236-241 & n 2 (involving, among other conduct constituting alienating behavior, exaggerated and fabricated allegations by a parent).

In this case, the trial court concluded that factor (j) slightly favored plaintiff, and in reaching this conclusion, the court analyzed factor (j) as follows:

> Both parties argue that the other is unwilling to facilitate their relationship with the children. Historically, [defendant] has maintained power over the extent of [plaintiff's] parenting time due to supervision requirements. During the covid-19 pandemic, [defendant] supervised [plaintiff's] parenting time, despite a problematic history of domestic violence between the parties. Countless motions for holiday parenting time and increased parenting time have been filed throughout the years as [defendant] has maintained that [plaintiff] has a personality disorder that would cause her to manipulate the children-he argues that her tendency toward manipulation would result in his alienation from the children. He bolsters this by citing false reports to CPS that he believes were catalyzed by [plaintiff] (even when

she is not listed as the reporter). Although CPS reports were initiated after she saw a rash on SK while changing her diaper during parenting time, there have been no alleged false CPS complaints in years. It is also apparent that Catholic Social Services initiated a complaint and that there was a valid concern regarding a rash on the minor child's bottom. When objecting to supervised visits, he could cite no problematic behavior by [plaintiff], other than "future talk", wore a body camera to visits, and misrepresented [plaintiff's] communications on [Our Family Wizard]. Ironically, while [defendant] insists that [plaintiff's] alleged personality disorder places him at risk of alienation, the only parent with substantial interruptions to their bond with the children is [plaintiff]. Regardless, to each parent's credit, over the past year, both have agreed that it is in the children's best interest to have a more equitable shared parenting time arrangement.

The trial court's findings related to factor (j) are against the great weight of the evidence for several reasons. First, the trial court erred by criticizing defendant for supervising plaintiff's videoconference parenting time visits during COVID-19. Judge Brown entered two separate orders providing for defendant's supervision of plaintiff's parenting time when in-person visits at Catholic Social Services became impossible as a result of COVID-19.[25] Defendant did nothing improper, and did not interfere with plaintiff's relationship with the children, by supervising Zoom visits as authorized by the court. The trial court's finding in this respect was against the great weight of the evidence.

Second, the trial court's findings regarding domestic violence and defendant's "power" are improper for the reasons already discussed. That is, Judge Van den Bergh erred by reopening long-settled issues and matters predating the divorce judgment. These issues were not before the court and should not have been used in the assessment of factor (j).

Third, when evaluating factor (j), the trial court erred by rewriting history and ignoring the law of the case with regard to the unreasonableness of plaintiff's conduct. This Court's previous opinion affirming Judge Brown's 2020 decision makes abundantly clear that plaintiff's attempts to photograph SK's genitalia were not reasonable conduct, but were another example of plaintiff's alienating behavior. The history of this case is that plaintiff made a false report of sexual abuse against defendant to the police before the divorce, and after the divorce she attempted to photograph SK's genitalia during a supervised parenting-time visit at Catholic Social Services—an activity that a Catholic Services employee intervened to prevent—in order to support new allegations that SK had a sexually transmitted disease, prompting a CPS complaint against defendant. See *Kuebler*, unpub op at 10-11. As discussed earlier, Judge Van den Bergh was free to conclude that plaintiff's behavior had improved and to credit plaintiff for not fabricating any new allegations against defendant since Judge Brown's 2020 order; Judge Van den Bergh erred, however, by ignoring the history of the case and concluding that plaintiff's allegations against

---

[25] Judge Brown also ordered that the Zoom visits would be recorded for the benefit of both parties, stating: "Given the divergent descriptions of the parties' actions toward each other, the Court is requiring that Zoom sessions be recorded as it benefits both parties."

defendant with regard to SK's rash had posed a "valid concern." This finding was also against the great weight of the evidence, particularly when it was one in a series of fabricated allegations by plaintiff.

Fourth, the trial court appeared to fault defendant for Judge Brown's entry of orders restricting plaintiff's parenting time and Judge Brown's denial of plaintiff's various motions to modify parenting time. Ignoring the long history of this case, plaintiff's conduct that prompted Judge Brown's rulings, and this Court's 2021 opinion affirming Judge Brown, the trial court found it "ironic[]" that defendant worried about alienation when "the only parent with substantial interruptions to their bond with the children is" plaintiff. In reality, the consent judgment was entered in part to protect the children, and their relationship with defendant, from plaintiff's propensity toward alienating and manipulative conduct, including fabricated allegations of child abuse. Judge Brown subsequently denied motions to change plaintiff's supervised parenting time because plaintiff had failed to satisfy MCL 722.27(1)(c); plaintiff's ongoing conduct, before November 2020, showed that her alienating conduct had not ceased. Judge Brown, not defendant, entered these orders. Suggesting that defendant interfered with plaintiff's relationship by complying with existing parenting-time orders designed to protect the children from plaintiff's demonstrated tendency to fabricate allegations of child abuse—an activity which every expert in this case agreed is harmful to children—is a distortion of the history of this case. Indeed, the trial court wholly ignored the wrongfulness of plaintiff's conduct in this case and the sound basis for defendant's concerns.[26] Yet, despite plaintiff's activities, there is no evidence in the record that defendant maligned her to the children or prevented her from exercising parenting time in compliance with court orders. Further, despite his well-founded fears that plaintiff would continue her pattern of making false allegations, defendant recently entered into multiple stipulations to afford plaintiff more parenting time with the children. On the whole, the trial court's conclusion that factor (j) favored plaintiff, even slightly, was resoundingly against the great weight of the evidence in this case. See *Brown*, 332 Mich App at 8-9.

Factor (k) involves "[d]omestic violence, regardless of whether the violence was directed against or witnessed by the child." MCL 722.23(k). Under this factor, for the reasons already discussed, the trial court improperly alluded to a history of domestic violence before the divorce judgment. The trial court also again improperly faulted defendant for supervising plaintiff's Zoom parenting time when, as discussed, defendant did so pursuant to Judge Brown's orders.

---

[26] Unlike Judge Brown, who ordered recording of the Zoom visits, Judge Van den Bergh took a negative view of recordings, and she criticized defendant, in the context of factor (j), for wearing a bodycam to parenting-time exchanges. It is, however, unclear how this affected plaintiff's relationship with the children. Further, the trial court's criticism of defendant in this regard again ignores the wrongfulness of plaintiff's conduct and the sound basis for defendant's concerns. In any event, defendant has not worn a bodycam since August 2021, almost a year before the trial court's July 2022 order. The trial court readily excused plaintiff's misconduct in the case on the basis of the passage of time and her lack of *recent* fabrications of abuse. The same reasoning supports that previously wearing a bodycam—which, if wrongful, is much less egregious than fabricating allegations of abuse—should not be counted against defendant under factor (j).

Nevertheless, any error in this regard was harmless with respect to the factor (k) analysis because the trial court also recognized that the parties had been separated for several years and that there was nothing in the present record indicative of domestic violence that would impact the care and custody of the children. In these circumstances, the trial court believed that this factor favored neither party. The trial court's conclusion that factor (k) favored neither party was not against the great weight of the evidence. See *Brown*, 332 Mich App at 8-9.

Lastly, factor (*l*) allows the trial court to consider "[a]ny other factor considered by the court to be relevant to a particular child custody dispute." MCL 722.23(*l*). The trial court did not consider any other factors under this provision, and neither party challenges the trial court's assessment of this factor.[27]

## 6. ADDITIONAL JOINT CUSTODY CONSIDERATIONS

Regarding joint legal custody, whether reviewed under a clear-and-convincing-evidence or the lower preponderance-of-the-evidence standard, the facts clearly preponderate against the trial court's conclusion that the parties in this case are able to communicate and make joint decisions regarding the children.

Joint custody can refer to joint physical or joint legal custody. See *Dailey v Kloenhamer*, 291 Mich App 660, 670; 811 NW2d 501 (2011). Joint legal custody, under MCL 722.26a, means that "the parents shall share decision-making authority as to the important decisions affecting the welfare of the child." See also *Dailey*, 291 Mich App at 670. "In order for joint custody to work, parents must be able to agree with each other on basic issues in child rearing—including health care, religion, education, day to day decision-making and discipline—and they must be willing to cooperate with each other in joint decision-making." *Bofysil v Bofysil*, 332 Mich App 232, 249; 956 NW2d 544 (2020) (quotation marks and citation omitted). Under MCL 722.26a(1), when joint custody is considered, the trial court shall determine whether joint custody is in the best interests of the children by considering the best-interest factors in MCL 722.23 and "[w]hether the parents will be able to cooperate and generally agree concerning important decisions affecting the welfare of the child."

In this case, in changing legal custody from defendant's sole legal custody to joint legal custody, the trial court found, by a preponderance of the evidence, that the parties were able to agree and communicate regarding the children's needs. The trial court recognized the antagonistic nature of the parties' divorce and litigation, but the trial court believed that the parties did not disagree on major issues relating to religion, education, health, therapy for the children, and "day to day activities." The trial court also noted that the children were "thriving" in both households. Addressing the parties' ability to communicate, the trial court recognized that the parties clearly harbored personal animosity toward each other and that they had difficulty communicating. However, the trial court noted that the parties were receiving unspecified "tools through therapy"

---

[27] The trial court also addressed a few parenting-time factors under MCL 722.27a(7), which the trial court found to be relevant, including the inconvenience of travel. Neither party raises any challenges to the trial court's analysis under MCL 722.27a(7).

to address these issues, and indicated that the trial court would "assist them in resolving both routine and non-routine matters." Although defendant had complained about plaintiff's failure to adhere to the Our Family Wizard orders, the trial court believed that plaintiff had "substantially" complied with the orders in connection with the overwhelming majority of conversations between the parties, and the trial court believed that the parties could communicate effectively via Our Family Wizard in the future.

Reviewing the entire record in this case, the facts clearly preponderate against the trial court's conclusion that the parties in this case are able to communicate and make joint decisions regarding the children. See *Brown*, 332 Mich App at 8. The history of this case demonstrates that the parties are so completely incapable of making decisions about their children together that the parties could not even agree on a *name* for their youngest child, and ultimately submitted that matter to the trial court; the trial court entered an order naming SK. The parties also had a documented inability to communicate, and it was precisely because of these issues that Judge Brown awarded defendant sole legal custody. Certainly, facts can change and communication can improve, but the record in this case does not, even by a preponderance of the evidence, support that the parties have learned to communicate and make joint decisions. To the contrary, the evidence clearly preponderates against the trial court's conclusion in this regard.

Of the issues that the parties have actually discussed and attempted to decide together in the last year, they have not reached a significant decision yet without the aid of third parties. For example, the trial court stated that they chose a therapist for the children. In actuality, plaintiff objected when defendant took the children to see Dr. Tracey Stulberg. Thereafter, the parties' *lawyers* were involved in calling therapists and trying to find anyone who would accept the children as new patients. To frame the selection of a therapist as evidence that the parties are capable of working together and reaching joint decisions does not accord with the record. Similarly, the parties have been unable to reach decisions, or to communicate amicably, about basic issues such as a parenting-time schedule to enable vacations during the summer of 2021; instead, the trial court had to resolve the issue.

The parties also endlessly disagreed about issues related to extracurricular activities, both parties presenting copious testimony about whether the children should play softball or T-ball in Ann Arbor or Northville. And this was not a simple scheduling issue. The parties fundamentally disagreed about whether it would be in the children's best interests to strengthen their current friendships by engaging in extracurricular activities in Northville or whether they should try to expand their social circle by playing softball and T-ball in Ann Arbor. They have also disagreed on matters relating to religion, including whether it was the right time for BK to act as an altar server. Moreover, the parties cannot even agree on the *method* used to communicate about the children. Defendant wanted to continue with Our Family Wizard, while plaintiff believed that it would be in the children's best interests for the parties to "normalize" their communications with the use of phone calls and texts. The GAL also expressed concern about the parties' ability to communicate, although she testified that she believed "they could get there."

We hope that, someday, the parties will learn to put their animosity aside to communicate and cooperate in decision-making for their children. However, in the here and now, the record does not support the conclusion that they can communicate and cooperate about even basic matters related to the children. Indeed, seeming to recognize the parties' inability to make joint decisions,

the trial court stated that the trial court would "assist" the parties in "resolving both routine and non-routine matters."[28] That is not the function of the trial court; if parties with joint legal custody cannot decide on *important* issues affecting the welfare of a child, a trial court will step in to determine the best interests of the child. See *Pierron v Pierron*, 282 Mich App 222, 247; 765 NW2d 345 (2009), aff'd 486 Mich 81 (2010). The trial court's belief that it needs to hold the parties' hands to help them make "routine" decisions is a strong indication that a change from defendant's sole legal custody to joint legal custody is not warranted in this case.[29]

Further, in discussing its decision to change custody to provide for joint legal custody, the trial court also stated that the children were "thriving" in both households. In actuality, the children are thriving in a custody arrangement involving shared physical custody and sole legal custody for defendant. The fact that the children are thriving under the existing arrangement does not support the conclusion that changing custody to joint legal custody would be in their best interests.

On the whole, considering the entire record, the evidence heavily preponderates against the trial court's conclusion that the parties are capable of communicating and cooperating to make joint decisions regarding health care, religion, education, day-to-day decision-making, and discipline. See MCL 722.23; *Bofysil*, 332 Mich App at 249. The trial court, therefore, abused its discretion by changing custody from sole legal custody to joint legal custody. *Id*.

In view of the numerous errors in this case, we vacate the trial court's order changing custody and we remand for further proceedings consistent with this opinion.

## III. REQUEST FOR A NEW JUDGE

Defendant asks this Court, if we remand for further proceedings, to remand to a different judge because Judge Van den Bergh is biased against him. When considering whether to remand to a new judge, the "general concern . . . is whether the appearance of justice will be better served if another judge presides over the case." *Bayati v Bayati*, 264 Mich App 595, 602; 691 NW2d 812 (2004). This Court "may remand to a different judge if the original judge would have difficulty in putting aside previously expressed views or findings, if reassignment is advisable to preserve the appearance of justice, and if reassignment will not entail excessive waste or duplication." *Id*. at 602-603. This Court will not, however, "remand to a different judge merely because the judge came to the wrong legal conclusion. Repeated rulings against a party, no matter how erroneous, or vigorously or consistently expressed, are not disqualifying." *Id*. at 603.

---

[28] The trial court also appointed the GAL for another year to "facilitate" the parties' communication.

[29] Indeed, ironically, plaintiff insists that the parties are capable of cooperating and making joint decisions without issue. Yet, in her appellate brief in what is the parties' thirteenth appeal to this Court, she predicts that the current appeal "very likely will not be the last." A joint decision-making process should not involve litigating—and appealing—every conceivable issue relating to the children.

-30-

In this case, defendant asserts that Judge Van den Bergh should be disqualified because she prejudged the case by awarding plaintiff unsupervised parenting time in April 2021 and overnight visits in July 2021 without holding evidentiary hearings and without following the procedures of the Child Custody Act. He challenges the correctness of many of her rulings and the propriety of Judge Van den Bergh's decision to reopen issues, such as the domestic-violence question. As discussed, in our view, Judge Van den Bergh made several notable errors in this case. With that said, erroneous rulings are not a basis for disqualification. See *id.* The record gives no indication that Judge Van den Bergh will have difficulty setting aside previously expressed views or findings. See *id.* Reassignment is also not advisable in this case to preserve the appearance of justice, and given the length of this case, reassignment to another new judge would entail needless waste and duplication. See *id.* In short, defendant has not demonstrated that reassignment is warranted at this time.[30]

## IV. CONTINUED APPOINTMENT OF THE GAL

Lastly, defendant argues that the trial court erred by continuing the GAL's appointment, and by denying his requests to terminate her appointment, because she is unqualified or biased or both. We disagree. Defendant preserved these issues by raising them in trial court. See *Glasker-Davis v Auvenshine*, 333 Mich App 222, 227; 964 NW2d 809 (2020). The trial court failed, however, to specifically address these arguments, hindering our review on appeal. See *In re Martin*, 200 Mich App 703, 717; 504 NW2d 917 (1993).

Despite the trial court's failure to explicitly address defendant's claims regarding the GAL's qualifications and bias, the trial court appointed the GAL for an additional year, suggesting that the trial court concluded that the GAL was sufficiently qualified and unbiased. And on the record presented, we see no basis to conclude that the trial court decision to continue the appointment of the GAL was an abuse of discretion. See *In re Toth*, 227 Mich App 548, 557; 577 NW2d 111 (1998). With regard to the GAL's qualifications, we initially note that MCL 722.27(1)(d) allows for the use of a GAL; it does not identify any specific qualifications that a GAL must possess to make recommendations in custody disputes. In other words, defendant has not shown that the GAL lacked any required qualifications. To the extent that he views the GAL as inexperienced, untrained, and unaware of the law surrounding child-custody disputes, those were bases for challenging the credibility and weight of her opinions in the trial court. See generally *Surman*, 277 Mich App at 309 (recognizing gaps or weaknesses in a witness's expertise as a proper subject for cross-examination). And defendant did in fact cross-examine the GAL about her experience, knowledge, and training. In sum, defendant was free to question the GAL about her qualifications and to challenge the GAL's credibility on this basis, but he has not shown that the GAL's qualifications, or lack thereof, warrant her removal.

---

[30] Indeed, this Court has already twice denied defendant's applications for leave to appeal the denials of his motions to disqualify Judge Van den Bergh, and those denials were for lack of merit in the grounds presented. The law-of-the-case doctrine applies to orders denying applications for lack of merit in the grounds presented. See *Pioneer State Mut Ins Co v Michalek*, 330 Mich App 138, 143-144; 946 NW2d 812 (2019).

With regard to bias, a GAL's bias against a parent or other findings that a GAL was not functioning as a neutral party to aid in the resolution of disputes would potentially provide a basis for terminating the GAL. See *In re Toth*, 227 Mich App at 557 (recognizing GAL's role as that of a "neutral party acting in the child's best interests" to expedite resolution of disputes). None of what defendant describes, however, appears to evince that the GAL was not acting as a neutral party. She was not, for example, inflaming the custody dispute, nor had she become so personally enmeshed as to preclude her from assisting the parties in resolving disputes. At most, defendant notes that the GAL reached opinions that were sometimes unfavorable to him, and he challenges the correctness of her recommendations as not comporting with the standards that govern a motion to change custody. However, unfavorable opinions and recommendations are not generally evidence of a deep-seated favoritism or bias that would make fair judgment impossible. See *Gates v Gates*, 256 Mich App 420, 440; 664 NW2d 231 (2003). Moreover,regardless of the involvement of a third-party investigator, such as a GAL or the FOC, a trial court remains obligated to reach its own conclusions. See *Truitt v Truitt*, 172 Mich App 38, 42; 431 NW2d 454 (1988).

Defendant was free to challenge the GAL's impartiality, her opinions, and the adequacy of her investigation through cross-examination. See *Powell v St John Hosp*, 241 Mich App 64, 72; 614 NW2d 666 (2000). Defendant has not, however, demonstrated that the GAL was so clearly biased against him as to necessitate her removal. Consequently, defendant has not shown that the trial court abused its discretion by declining defendant's request to terminate the GAL's appointment and instead appointing her for another year.

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Mark T. Boonstra
/s/ Michael F. Gadola
/s/ Christopher P. Yates